

**SEALED**

MPP/BAM/KSP: USAO 2024R00210

USDC- BALTIMORE
'26 APR 8 PM3:57

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| **UNITED STATES OF AMERICA** | * |
| | * |
| v. | *   **CRIMINAL NO.** JKB 26cr118 |
| | * |
| **SYNERGY MARINE PRIVATE** | *   **(Conspiracy to Defraud the United States** |
| **LTD. d/b/a SYNERGY MARINE** | *   **and to Commit Offenses Against the United** |
| **GROUP,** | *   **States, 18 U.S.C. § 371; Ports & Waterways** |
| | *   **Safety Act – Failure to Report a Hazardous** |
| | *   **Condition, 46 U.S.C. § 70036(b);** |
| **SYNERGY MARITIME PRIVATE** | *   **Misconduct or Neglect of Ship Officers** |
| **LTD. d/b/a SYNERGY MARINE** | *   **Resulting in Death, 18 U.S.C. § 1115;** |
| **GROUP, and** | *   **Obstruction of an Agency Proceeding, 18** |
| | *   **U.S.C. § 1505; False Statements, 18 U.S.C.** |
| **RADHAKRISHNAN KARTHIK** | *   **§ 1001; Clean Water Act – Discharge of** |
| **NAIR,** | *   **Pollutants, Discharge of a Harmful** |
| | *   **Quantity of Oil, 33 U.S.C. §§ 1311, 1319 and** |
| **Defendants** | *   **1321; Discharge of Refuse, 33 U.S.C. §§ 407** |
| | *   **and 411; Aiding and Abetting, 18 U.S.C.** |
| | *   **§ 2; Forfeiture, 33 U.S.C. § 412)** |
| | * |
| | *   **UNDER SEAL** |
| | * |

*****

## INDICTMENT

The Grand Jury for the District of Maryland alleges that:

### COUNT ONE
### (Conspiracy to Defraud the United States and
### to Commit Offenses Against the United States)

At all times relevant to this Indictment:

### Introduction

1.      The *Motor Vessel Dali* ("*M/V Dali*") was a 984-foot, 95,128 gross ton foreign flagged container ship registered in Singapore. The *M/V Dali* transported commercial cargo internationally and into and out of ports in the United States, including the Port of Baltimore.

1

2.      The Francis Scott Key Bridge ("Key Bridge") was a highway bridge that crossed the Fort McHenry Channel and was located on the lower Patapsco River near Baltimore, Maryland. The Key Bridge opened on March 23, 1977, and was used by approximately 12 million vehicles annually, including trucks carrying hazardous materials that were prohibited from transiting other routes with tunnels near Baltimore.

3.      At approximately 1:29 a.m. on March 26, 2024, after leaving the Port of Baltimore, the *M/V Dali* crashed into the Key Bridge, causing the death of six construction workers and the destruction of the bridge. The allision[1] also resulted in the pollution of the Patapsco River and the Chesapeake Bay from the destroyed bridge, vehicles, and debris, and from the *M/V Dali*, including oil and cargo containers. The destroyed bridge obstructed the channel and shut down the Port of Baltimore for vessel arrivals and departures. The Port of Baltimore was not fully reopened until June 10, 2024, 77 days after the allision. Reconstruction of the bridge is ongoing, and the complete eastern span of Interstate 695 has not been open since the allision.

4.      The *M/V Dali* struck the Key Bridge because the vessel lost power twice in a roughly four-minute span prior to striking the bridge. The first blackout was likely caused by a loose wire in a high-voltage switchboard. The ship quickly regained power after the first blackout, but a second blackout occurred shortly thereafter. The second blackout occurred because the defendants relied on a flushing pump to supply fuel to two of the ship's four generators. Unlike the pumps designed to service these generators, the flushing pump could not automatically restart following a blackout. The flushing pump needed to be manually restarted. When the flushing

---

[1] An allision occurs when a moving object strikes an object that is not moving.

pump was not restarted in time after the first blackout, the ship's two running generators became starved of fuel, causing a second blackout.

5.     Consistent with the law governing commercial vessels and accepted engineering practices, the *M/V Dali* was built with automated redundancies that enabled the vessel to quickly recover from a power loss.  The *M/V Dali*'s fuel supply and booster pumps were designed to automatically restart in the event of a power outage.  Those fuel supply pumps also had back-up standby pumps.

6.     The *M/V Dali* was never designed or approved to use the flushing pump as a continuous supply pump for its generators.  The flushing pump did not automatically restart and did not have a redundant standby pump.

7.     If the *M/V Dali* had used the proper fuel supply and booster pumps, then the vessel would have regained power in time to safely navigate under the Key Bridge.

8.     The operators of the *M/V Dali*, **SYNERGY MARINE PRIVATE LTD.** and **SYNERGY MARITIME PRIVATE LTD.** (collectively "**SYNERGY**"), had been using the flushing pump as a continuous fuel supply pump on at least three vessels since 2020.  The dual-blackout on the night of the allision was at least the third dual-blackout experienced by a **SYNERGY** vessel.  The *M/V Dali* experienced two dual-blackouts within approximately ten hours.  The first dual-blackout on the *M/V Dali* occurred while the vessel was docked in the Port of Baltimore on March 25, 2024.  The second dual-blackout occurred that night and resulted in the allision.  The third dual-blackout occurred fifteen months earlier on another **SYNERGY** vessel, the *M/V Maersk Saltoro*, which also used the flushing pump.

9.     **SYNERGY** employees, including shoreside technical managers, knew of the improper use of the flushing pump and the risks that it presented. **SYNERGY** employees took

3

steps to hide the use of the flushing pump on the *M/V Dali* and other **SYNERGY** vessels. Following the allision, multiple **SYNERGY** managers, including **RADHAKRISHNAN KARTHIK NAIR,** lied to investigators about whether they knew that the flushing pump had been used as a continuous fuel supply pump on the *M/V Dali* and other **SYNERGY** vessels.

10.    Further, **SYNERGY** had a history of failing to document and address significant safety risks. **SYNERGY** failed to report hazards, casualties, and other safety issues to the United States Coast Guard ("U.S. Coast Guard") and other regulatory authorities. **SYNERGY** shoreside technical managers fabricated and directed the fabrication of safety inspections and certifications related to many vessel systems, including the fuel supply system of the *M/V Dali*.

### The Defendants and Relevant Entities

11.    **SYNERGY MARINE PRIVATE LTD. ("SYNERGY MARINE")** was the operator of the *M/V Dali*. **SYNERGY MARINE** was registered in Singapore and maintained offices in India and Singapore. The *M/V Dali* was registered in Singapore. The country of registration was referred to as the "Flag State." **SYNERGY MARINE** provided ship management and technical management services, which included crewing, supervision, and control over a fleet of vessels on behalf of ship owners. Synergy Marine employed one of its subsidiaries, **SYNERGY MARITIME PRIVATE LTD.** to manage several vessels, including the *M/V Dali*.

12.    **SYNERGY MARITIME PRIVATE LTD. ("SYNERGY MARITIME")** was located in Chennai, India, and, in addition to managing the *M/V Dali*, **SYNERGY MARITIME** managed its own fleet of vessels. **SYNERGY MARITIME** employed shore-based superintendents including Marine Superintendents and Technical Superintendents who were engaged in day-to-day management of both fleets. **SYNERGY MARITIME** was also the

4

operator and technical manager of the *M/V Maersk Saltoro* and the *M/V Cezanne*, which were designed with the same specifications as the *M/V Dali*.

13.    **SYNERGY MARINE** and **SYNERGY MARITIME** both did business as the **SYNERGY MARINE GROUP**.  Although not separately incorporated, **SYNERGY MARINE GROUP** had a webpage that described a "network of 31 offices in 15 countries and employing more than 28,000 seafarers" that managed a fleet of more than approximately 700 vessels. https://www.synergymarinegroup.com/ (last viewed April 7, 2026).

14.    **RADHAKRISHNAN KARTHIK NAIR ("NAIR")** was an employee of **SYNERGY MARITIME** and, pursuant to an agreement between **SYNERGY MARINE** and **SYNERGY MARITIME**, served as the Technical Superintendent for the *M/V Dali*. As Technical Superintendent, **NAIR** was the principal shore-based technical representative for the *M/V Dali* and was responsible for oversight of the day-to-day engineering operations of the vessel. At all times relevant to this Indictment, **NAIR** was acting as an agent and employee of **SYNERGY**.

15.    CHIEF ENGINEER 1 ("CE 1") was the Chief Engineer aboard the *M/V Dali* at the time of the allision.  According to **SYNERGY**'s internal policies, the Chief Engineer's responsibilities include, "Operation and Maintenance of all machinery in the engine room and on deck according to Classification Societies' requirements, flag state requirements, nation and international rules, and regulations." CE 1 also previously served as an engineer on the *M/V Cezanne* and *M/V Maersk Saltoro*. At all times relevant to this Indictment, CE 1 was acting as an agent and employee of **SYNERGY**.

16.    TECHNICAL SUPERINTENDENT 2 ("TS 2") was an employee of **SYNERGY MARITIME** and was the Technical Superintendent for the *M/V Cezanne* and the *M/V Maersk*

5

*Saltoro*. At all times relevant to this Indictment, TS 2 was acting as an agent and employee of **SYNERGY**.

17. OWNER was the owner of the *M/V Dali*. OWNER hired **SYNERGY** to act as its agent and to manage all operations of the *M/V Dali*. OWNER employed the crew of the *M/V Dali* at the time of the allision. Although technically employed by OWNER, the crew of the *M/V Dali* acted as agents and employees of **SYNERGY** and acted at the direction of, and were under the control of, **SYNERGY**.

18. CHARTERER was the charterer of the *M/V Dali* at the time of the allision. CHARTERER contracted with OWNER to transport cargo to and from ports around the world. CHARTERER was also responsible for paying for the fuel consumed on the *M/V Dali*.

19. MASTER was the Master and Captain of the *M/V Dali* at the time of the allision. According to **SYNERGY**'s internal policies, "The Master has overall responsibility for safe navigation of his vessel in accordance with flag state laws and international regulations. The Master has the overriding authority and discretion to take whatever action he considers to be in the best interest of the crew, ship, company, cargo, and marine environment." At all times relevant to this Indictment, MASTER was acting as an agent and employee of **SYNERGY**.

20. CLASS was the classification society, also referred to as a registered organization, that was authorized by the Flag State to issue the relevant safety certificates for the *M/V Dali* to conduct business in the United States and other international ports and waters.

21. The U.S. Coast Guard, an agency of the U.S. Department of Homeland Security, was charged with enforcing the laws of the United States and was empowered under Title 14, United States Code, Section 522(a), to board vessels and conduct inspections and investigations of potential violations of applicable law. In conducting inspections, U.S. Coast Guard personnel

relied on the statements of the vessel's crew and the vessel's documents, such as official certificates issued by the Flag State and Class attesting to the vessel's compliance with international laws, rules, and standards, including those relating to safety and pollution.

22.     Individual 1, Individual 2, Individual 3, Individual 4, Individual 5, and Individual 6 were construction workers who were killed as a result of the allision.  They all resided in Maryland.

### The Port of Baltimore, the Patapsco River, and the Francis Scott Key Bridge

23.     The Port of Baltimore, Maryland, was located amongst the tidal basins of the three branches of the Patapsco River, on the upper northwest shore of the Chesapeake Bay.  The Port of Baltimore had five terminals, including the Seagirt Marine Terminal, which had four deep berths and associated cranes that handled the loading and unloading of large cargo ships.  The Key Bridge spanned the Port of Baltimore, lower Patapsco River, and outer Baltimore Harbor.  The waters that passed under the bridge were known as the Fort McHenry Channel and were located within the internal waters of the United States and maintained by the U.S. Army Corps of Engineers.

### Regulation of Commercial Vessels

24.     The International Convention for the Safety of Life at Sea ("SOLAS") was an international maritime treaty first adopted in 1914 in response to the sinking of the *RMS Titanic*. SOLAS established minimum safety standards in the construction, equipment, and operation of commercial vessels such as the *M/V Dali*.  At the time of the Key Bridge allision, 167 countries were parties to SOLAS, including the United States, Singapore, and India.

25.     SOLAS Chapter II-1, Part E, Regulation 53 required standby equipment for auxiliary machinery essential to propulsion, including automatic changeover devices.  SOLAS Chapter II-1, Part C, Regulation 26 required that propulsion machinery would continue to operate

even if one essential auxiliary system became inoperative. Fuel oil supply systems were listed as one of the auxiliaries requiring redundancy. SOLAS, Chapter II-1, Part C, Regulation 31 required as follows:

> Main and auxiliary machinery essential for the propulsion, control and safety of the ship shall be provided with effective means for its operation and control. All control systems essential for the propulsion, control and safety of the ship shall be independent or designed such that failure of one system does not degrade the performance of another system.

26. Pursuant to SOLAS Chapter IX, the owner or other company operating the vessel, and the vessel itself, had to comply with the requirements of the International Safety Management Code ("ISM Code"), including the requirement to have a Safety Management System.

27. The purpose of the ISM Code was to provide an international standard for the safe management and operation of ships and for pollution prevention. The United States codified the requirement that persons responsible for a vessel comply with ISM Code in Title 46 of the United States Code, Chapter 32, and in the regulations set forth in Title 33, Code of Federal Regulations, Part 96.

28. Pursuant to SOLAS Chapter IX, a Document of Compliance ("DOC") was issued to every company that complies with the requirements of SOLAS and the ISM Code. The Flag State was responsible for issuing the DOC. Pursuant to SOLAS, vessels had to carry the DOC on board. These records were regularly inspected by port states, including the United States. **SYNERGY MARINE** was the DOC holder for the *M/V Dali*.

29. A ship classification society, such as CLASS, was a non-governmental organization that established and maintained technical standards for the construction and operation of ships and offshore structures. These societies set technical rules based on experience and research,

8

confirmed that designs met these rules, surveyed ships during the process of construction and commissioning, and periodically surveyed vessels to ensure that they met these rules.

30.     A "marine casualty or accident" was defined in federal regulations to include:

> Events caused by or involving a vessel and includes, but is not limited to, the following: . . . (2) Any occurrence involving a vessel that results in— . . . (ix) Reduction or loss of a vessel's electrical power, propulsion, or steering capabilities; [or] (xi) Any other circumstance that might affect or impair a vessel's seaworthiness, efficiency, or fitness for service or route . . . .

46 C.F.R. § 4.03-1.

31.     Certain marine casualties had to be reported by the owner, agent, master, operator, or person in charge of a vessel "[i]mmediately after the addressing of resultant safety concerns" by notifying "the nearest Sector Office, Marine Inspection Office or Coast Guard Group Office..." Immediately reportable casualties included instances when a vessel had:

> (3) A loss of main propulsion, primary steering, or any associated component or control system that reduces the maneuverability of the vessel; (4) An occurrence materially and adversely affecting the vessel's seaworthiness or fitness for service or route, including but not limited to fire, flooding, or failure of or damage to fixed fire-extinguishing systems, lifesaving equipment, auxiliary power-generating equipment, or bilge-pumping systems[.]

46 C.F.R. § 4.05-1(a)(3), (4).

### The Ports & Waterways Safety Act

32.     Congress enacted the Ports and Waterways Safety Act ("PWSA"), 46 U.S.C. §§ 70011 *et seq.*, because increased supervision of vessel and port operations was necessary to reduce the possibility of vessel or cargo loss, or damage to life, property, or the marine environment. 33 U.S.C. § 1221(c)(l). Pursuant to 46 U.S.C. § 70036(b)(l), a person violated the PWSA if the person willfully and knowingly violated a regulation promulgated under the PWSA.

9

33.    The PWSA regulations governed a wide variety of vessel operations. Federal regulations authorized pursuant to the PWSA required the owner, agent, master, operator, or other person in charge of a vessel to immediately notify the nearest U.S. Coast Guard Sector office whenever there is a hazardous condition, either aboard a vessel or caused by the vessel or its operation. 33 C.F.R. § 160.216.  The requirement to notify the U.S. Coast Guard of hazardous conditions was applicable to foreign vessels bound for or departing from ports or places in the United States. 33 C.F.R. §§ 160.203(a)(2), 160.216.

34.    Federal regulations defined a "hazardous condition" as "any condition that may adversely affect the safety of any vessel, bridge, structure, or shore area or the environmental quality of any port, harbor, or navigable waterway of the United States. It may, but need not, involve collision, allision, fire, explosion, grounding, leaking, damage, injury or illness of a person aboard, or manning shortage." 33 C.F.R. § 160.202. The requirement to notify the U.S. Coast Guard of hazardous conditions applied to foreign vessels bound for or departing from ports or places in the United States. 33 C.F.R. § 160.203(a)(2).

**The Rivers and Harbors and Refuse Act**

35.    The Rivers and Harbors Appropriation Act of 1899 (33 U.S.C. § 403; Chapter 425, March 3, 1899; 30 Stat. 1151), commonly known as the Rivers and Harbors Act of 1899 ("RHA"), was enacted to preserve and protect the navigable waters of the United States.  Under the RHA, it was an offense to obstruct, alter or modify the condition and capacity of a navigable waterway of the United States without a permit issued by the Army Corps of Engineers. 33 U.S.C. §§ 403, 406. The RHA defined "navigable waters" as those waters subject to the ebb and flow of the tide and/or waters that are presently used, have been used in the past, or may be susceptible to use to transport interstate or foreign commerce. 33 C.F.R. §§ 322.2(a), § 329.4. The Patapsco River and Fort

McHenry Channel were navigable waters of the United States. Section 407 of the RHA, commonly referred to as the Refuse Act, made it a crime to throw, discharge, or deposit any refuse matter of any kind or description into any navigable water of the United States from a ship or other floating craft of any kind without a permit issued by the Army Corps of Engineers.

## The Clean Water Act

36.    The Federal Water Pollution Control Act, commonly referred to as the "Clean Water Act," 33 U.S.C. § 1251 *et seq.*, was enacted in 1972.  The purpose of the Clean Water Act was the restoration and maintenance of the chemical, physical, and biological integrity of the Nation's waters.  33 U.S.C. § 1251(a).  In addition, the Clean Water Act was enacted to prevent, reduce, and eliminate water pollution and to conserve the waters of the United States for the protection and propagation of aquatic life and wildlife, recreational purposes, public drinking water, and agricultural and industrial uses.  33 U.S.C. § 1252(a).  Under the Clean Water Act, a person commits a criminal offense by negligently discharging a pollutant into the waters of the United States from a point source, except when authorized. 33 U.S.C. §§ 1311(a), 1319(c)(1).  The term "pollutant" included biological material and wrecked or discarded equipment discharged into water.  33 U.S.C. § 1362(6).

## The Oil Pollution Act

37.    The Oil Pollution Act of 1990 amended the Clean Water Act by prohibiting discharges of oil or hazardous substances into or upon the navigable waters of the United States and the adjoining shorelines. Pursuant to the Oil Pollution Act, it was an offense for a person to negligently discharge oil into or upon the navigable waters and contiguous zone of the United States in such quantities as may be harmful. 33 U.S.C. §§ 1319(c)(1), 1321(b)(3).

11

38.    "Discharge" meant any spilling, leaking, pumping, pouring, emitting, emptying or dumping. 33 U.S.C. § 1321(a)(2). "Oil" meant oil of any kind or in any form, including, but not limited to, petroleum, fuel oil, sludge and oil residue. 33 U.S.C. § 1321(a)(1). Federal regulations defined a "harmful" quantity of oil as including any discharges of oil that cause a film or sheen upon or discoloration of the surface of the water or adjoining shorelines. 40 C.F.R. § 110.3.

### Synergy's Safety Management System

39.    As required by SOLAS Chapter IX and the ISM Code, **SYNERGY** maintained a Safety Management System ("SMS"). **SYNERGY**'s SMS was a series of manuals that provided instructions, guidelines, and policies regarding the safe operation of the vessel.  The Ship Management Manual, Technical Manual, and Contingency Manual were essential components of **SYNERGY**'s SMS.  **SYNERGY** did not provide an SMS that was specific to the operation of the *M/V Dali*.

40.    **SYNERGY**'s SMS contained provisions that prohibited the alteration of certain equipment without approval from the flag state or the classification society.  Specifically, Annex 03A of **SYNERGY**'s Ship Management Manual contained the following provision:

4.  **No modifications shall be permitted to the original equipment or machinery involved in the safety and performance output of the vessel unless it is approved by the flag state/Classification Society or original manufacturers.**

41.    **SYNERGY** did not obtain approval from Singapore or CLASS to use the flushing pump as the continuous fuel supply pump for Generators 3 and 4.

42.    Section 7.10 of **SYNERGY**'s Ship Management Manual, regarding the Chief Engineer's Responsibilities and duties, stated as follows:

> - Ensure that all matters related to the technical situation of the vessel deviating from the planned operation as set down in charter parties, own or other plans and procedures are reported immediately to the technical division. He must ensure that under no circumstances operational safety systems are bypassed or ignored unless measures are taken to maintain a safe operation. All such deviations from a safety system must be reported to the company explaining the background for the deviation.

43.    Section 2.5.7 of **SYNERGY**'s Technical Manual stated as follows:

> **2.5.7   STAND BY PUMPS**
>
> All the standby pumps such as cooling water pumps, Fuel oil pumps, lubricating oil pumps, feed and boiler water circulating pumps shall be kept always on automatic mode. All changeover of pumps shall be performed in port at the beginning of each passage (not necessary for short voyages which are less than 3 days sea passage) by tripping the running machinery to enable automatic start of standby pump.
>
> Changeover to standby pumps should be planned in such a way that a possible starting failure of the standby pump shall not affect the cargo operations. Any problem noted regarding the automatic start should be rectified on priority basis.

44.    The fuel oil pumps referenced in Section 2.5.7 had standby pumps that were to be set to automatically start in the event of a failure of the primary fuel supply system. **SYNERGY**'s decision to use the flushing pump as the primary fuel supply pump in the fuel supply system for generators 3 and 4 eliminated the redundancy of the primary fuel system and standby pumps.

45.    The Synergy Contingency Manual, Edition III, 02-Feb-24 provided instructions to **SYNERGY** personnel on how to respond to certain events or "contingencies." Section 1.1 of **SYNERGY**'s Contingency Manual stated that its purpose was to "provide[] guidelines and instructions that assist in making an efficient response to emergency situations onboard ships operated by Synergy Group." Section 1.5 defined categories of emergencies. A Level 2 incident was defined as "[a]n incident that can be dealt with on board but because of possible off-site effects

13

will require the involvement of external agencies. There may be danger: To life; To the environment; To company assets and reputation; To third party assets." A Level 3 incident was defined as an incident "with a potential for casualties, widespread damage to the environment or ships' property requiring the involvement of the port or flag states and third-party agencies."

46.    Section 2.5 of **SYNERGY**'s Contingency Manual contained instructions for recovering from a contingency. It stated, in relevant part:

> The vessel and office crisis team shall take the following into consideration to assess the vessel's suitability for resuming passage or planned operation.
>
> . . .
>
> 3. Function of vessel critical machinery. If any of it is underperforming, then alternatives are available to mitigate risk.
>
> . . .
>
> 5. Vessel can safely manoeuvre with its own propulsion and steering machinery.
>
> . . .
>
> 10. All stakeholders (owners, charter, flag, agent, coastal authority, insurance etc.,) are informed for resumption of passage.
>
> . . .
>
> 12. Risk assessment completed to judge vessel suitability for voyage. (Refer sample risk assessment)

47.    Chapter 02A of **SYNERGY**'s Contingency Manual contained a response chart for certain levels of incidents, corresponding to the levels described in Section 1.5. For power failures, the chart, shown below, stated that a power failure was a Level 2/3 Incident that must be reported "as required by the coastal state."

14

| LEVEL (Refer to section 1.5) | Nature of the incident | Reporting by vessel to office | Reporting by vessel to Authorities (In consultation with the office) | Reporting by office to Authorities |
|---|---|---|---|---|
| 2 / 3 | Power Failure (when the vessel is in coastal waters and / or near navigational hazards and/or high traffic density and / or in heavy weather – imminent danger) | | As required by the coastal state / VTIS | As required by the coastal state |
| 2 / 3 | ME failure (when the vessel is in coastal waters and / or near navigational hazards and/or high traffic density and / or in heavy weather – imminent danger) | | | |

48.    Section 3 of **SYNERGY**'s Contingency Manual discussed record keeping. Section 3.1 stated, "Record keeping is very important as, during investigations, they are used to reconstruct the actual incident, to analyse the actions taken before the incident and after the recovery phase, to arrive at the causes an equitable apportioning of salvage costs, if applicable." It further stated, "It is vital to make a note or report any incident immediately, if possible while it is still in progress. Contemporary evidence is of utmost importance." It further stated, "An incident report in the prescribed format shall be prepared for all accidents as soon as possible."

49.    Similar documentation provisions were also contained in Chapter 2 of **SYNERGY**'s Technical Manual. Chapter 2.3.9 of **SYNERGY**'s Technical Manual required the engineer's logbook and movement books to be kept by the engine department using the official publication furnished by Synergy. Chapter 2 of **SYNERGY**'s Technical Manual also stated that "Scrupulous accuracy is essential when making entries in logbooks, movement books and other records." **SYNERGY**'s Technical Manual further stated that the engineer on watch "shall make the required entries in the engineer's logbook during the watch and shall sign it after being relieved and before leaving the engine."

50.    Section 5.7 of **SYNERGY**'s Contingency Manual contained response measures for an electrical power failure. It stated, in part, "Failure of electrical power could have serious consequences, particularly when the vessel is navigating in restricted waters. . . . A quick investigation, to determine if the reason for the blackout was a mechanical or electrical problem, should precede the restarting, to ensure a greater degree of success in restoring the power."

51.    Appendix 01 to **SYNERGY**'s Technical Manual contained the Chief Engineers Standing Order Book. On the last page of the Appendix, it stated, "In case of black-out, all engine room staff should maintain calm and restore back ship as per checklist."

52.    The checklist included measures to be taken during a blackout and after power had been restored. The checklist stated that when a loss of power occurred while the ship was at the terminal, that the crew must "Advise Terminal." When power had been restored, the crew was to "Advise Terminal" and "Advise all parties concerned."

53.    Additional Chief Engineer Standing Orders required the crew of the *M/V Dali* to record any "generator trips" in the engine room logbook and in their electronic ship maintenance system, ShipPalm.

### Overview of the *M/V Dali* Fuel Supply System

54.    Four diesel generators, also referred to as auxiliary engines, provided power to the *M/V Dali*. The generators were numbered 1 through 4. The generators on the *M/V Dali* consumed fuel to generate electricity. The fuel supply system that supplied fuel to the generators was designed with redundancies and automated features that enabled the system to quickly and automatically recover in the event of a power outage. For instance, the fuel supply and booster pumps that supplied fuel were designed to automatically restart following a blackout. Additionally, the fuel

supply and booster pumps had a set of standby pumps that automatically restarted in the event of the failure of the primary pumps.

55.    Fuel was supplied to the generators through two separate supply lines, commonly referred to as the Generator Engine Fuel Oil System and the Main Engine Fuel Oil System. The Generator Engine Fuel Oil System supplied fuel to generators 3 and 4 while the Main Engine Fuel Oil System supplied fuel to the main engine and generators 1 and 2.

56.    The flushing pump was a maintenance pump, which flushed the fuel lines of existing fuel. The flushing pump can service all four generators.

57.    From in or around 2020 through the allision, the *M/V Dali* used the flushing pump as the continuous fuel supply pump for generators 3 and 4.

58.    Unlike the fuel supply and booster pumps that comprised the Generator Engine Fuel Oil System, the flushing pump was not designed to automatically restart following a power loss.

59.    Unlike the fuel supply and booster pumps in the Generator Engine Fuel Oil System, the flushing pump did not have a standby pump.

60.    Unlike the fuel supply and booster pumps, the flushing pump could not be started remotely from the engine control room.

61.    The *M/V Dali*'s use of the flushing pump as the primary fuel supply pump in the fuel supply system for generators 3 and 4 was not approved by CLASS or the Flag State, Singapore.

### Overview of the *M/V Dali* Electrical System

62.    The *M/V Dali* had two distribution switchboards that provided electricity to the ship, a high voltage ("HV") switchboard and a low voltage ("LV") switchboard. The generators provided electricity to these switchboards, which then distributed electricity throughout the vessel.

The switchboards also protected electrical equipment by shutting off electricity when an abnormal condition was detected. This was done by "opening" a circuit breaker, which broke the electrical circuit. Power could be restored by "closing" the circuit breaker.

63.    The HV Switchboard powered relatively high-powered equipment, such as the Main Engine's lubricating oil pump, bow thruster, scrubber system, and refrigerated container system. It also distributed electricity to the LV Switchboard. Before that electricity could go to the LV Switchboard, the electricity had to be converted into a lower voltage by one of the vessel's two main transformers. The LV Switchboard then distributed electricity to relatively low-powered equipment, including the fuel supply pumps and certain auxiliary functions of the main engine. Circuit breakers existed between each transformer and each switchboard. The switchboards were connected by two different circuits, for redundancy purposes, although only one circuit was in use at any given time.

64.    The circuit breakers that linked the transformers to the HV Switchboard had two recovery modes: "manual" or "automatic." When the circuit breaker was set to automatic mode, the recovery system would, upon restoration of the HV Switchboard after an outage, automatically close the circuit breaker to reengage one of the transformers. When the circuit breaker was set to a manual recovery mode, a human operator had to manually close the circuit breaker to restore power.

**The December 9, 2022 Dual-Blackout on the *M/V Maersk Saltoro***

65.    On or about December 9, 2022, the *M/V Maersk Saltoro* experienced a blackout following maintenance on generator 2. The alarms indicated that the cause of the blackout was a lube oil pressure alarm on generator 2. The *M/V Maersk Saltoro* was a sister ship of the *M/V Dali,* and the vessels had the same designs for their fuel supply systems. After generator 2 failed,

18

generator 3 automatically started, but the *M/V Maersk Saltoro* experienced a second blackout due to the vessel's improper reliance on the flushing pump as the primary fuel supply pump in the fuel supply system for generators 3 and 4.

66.    On August 28, 2023, TS 2, who was the Technical Superintendent for the *M/V Maersk Saltoro*, received an email from another **SYNERGY** employee explaining that the vessel experienced two blackouts and that the second blackout was caused by the flushing pump.

### The March 25, 2024 Dual-Blackout on the *M/V Dali* in Port

67.    On March 25, 2024, at approximately 2:20 pm, while the *M/V Dali* was docked in the Port of Baltimore, a crewmember was performing repairs on the scrubber for generator 2.  The crewmember inadvertently caused the exhaust damper to close, which caused pressure to back-up into generator 2.  The pressure back-up caused generator 2 to stall, and the vessel lost power.

68.    As part of the ship's automated recovery, the ship automatically restored power, relying on generator 3 to supply power.  Generator 3 was in "standby" mode, meaning that it would be the first generator to turn on if there was a problem with another generator.  When generator 3 came online, the flushing pump had not been restarted.  Generator 3 ran on the residual fuel in its fuel oil system and, approximately five minutes after coming online, generator 3 became starved of fuel, and the ship had a second blackout.

69.    **SYNERGY**'s SMS required the crew to investigate the blackouts, document the investigation, report the blackout to the port, and report the blackout to the U.S. Coast Guard.

70.    The crew of the *M/V Dali*, including CE 1, did not notify the terminal, the Port of Baltimore, the U.S. Coast Guard, CLASS, or Singapore following a dual-blackout on March 25, 2024.  **SYNERGY** shoreside personnel received alerts associated with the dual-blackout on March 25, 2024, and they likewise did not alert any relevant organization of the dual-blackout.

71.     The crew of the *M/V Dali* did not record the generator trips from March 25, 2024 in the engine room logbook.

**The Details of the Allision**

72.     All times stated herein are approximate and are Eastern Daylight Times.

73.     Just after midnight on March 26, 2024, an Association of Maryland Pilots ("AMP") senior pilot, PILOT 1, and an apprentice pilot, PILOT 2, boarded the *M/V Dali*.

74.     During the master-pilot exchange, MASTER reported to the pilots that the ship was in good working order.

75.     At 12:36 a.m., the *M/V Dali* departed Seagirt Terminal assisted by two tugboats, and at 1:07 a.m., the *M/V Dali* entered the Fort McHenry Channel. The tugboats disengaged from the *M/V Dali* once the vessel was safely off of the dock and in the Fort McHenry Channel.

76.     At 1:24:59 a.m., the *M/V Dali* experienced a loss of electrical power to the LV Switchboard. The loss of power was likely caused by a loose wire in the HV Switchboard. Due to the loose wire, the relevant circuit breaker opened, cutting power to the LV Switchboard. The loss of LV power caused the main engine to begin to shut down. At 1:25:00 a.m., the main engine shut down.

77.     At 1:25:58 a.m., the LV Switchboard recovered power when the crew manually activated Transformer 2 ("TR 2"), the transformer on the second circuit that could transfer power from the HV Switchboard to the LV Switchboard. The ship was designed to transfer power from one circuit to the other circuit automatically; however, the power transfer was set to "manual" mode, requiring a person to manually activate the circuit. The restoration of power to the LV Switchboard initiated a series of sequential starts on the vessel equipment.

20

78.     At 1:25:59 a.m., PILOT 1 called the AMP dispatcher and told the dispatcher to shut down the Key Bridge.

79.     At 1:26:10 a.m., the crewmember who was manning the helm (steering wheel), stated "we are swinging to starboard sir." PILOT 1 responded "port twenty," which was an instruction to the helmsman to turn the helm 20 degrees to port.

80.     At 1:26:42 a.m., electrical power had been supplied to all of the equipment necessary to operate the vessel. The flushing pump, however, needed to be manually restarted.

81.     At 1:26:38 a.m., PILOT 1 called for any available tugboats.

82.     At 1:27:04 a.m., the *M/V Dali* experienced a second power outage when the fuel oil supply to generators 3 and 4 dropped because the flushing pump had not been manually restarted. The drop in fuel pressure led to a second blackout.

83.     At 1:27:06 a.m., generator 2, the standby generator, successfully connected to the HV Switchboard. The crew, however, took another 20 seconds before manually closing TR 2, resupplying power to the LV Switchboard. The crew needed to manually close TR 2 because it had been set to "manual" mode and not "automatic" mode.

84.     At 1:27:23 a.m., PILOT 1 stated "hard port," instructing the helmsman to turn the wheel all the way to the left.

85.     At 1:27:35 a.m., the ship recovered from the second power outage and power was restored to the LV Switchboard and to the vessel. The restoration of power to the LV Switchboard initiated a series of sequential starts on the vessel equipment.

86.     At 1:27:42 a.m., PILOT 1 called for the bow thruster to be used at "full to port," which was reiterated by MASTER, but the bow thruster never activated.

87. At 1:28:20 a.m., power had been restored to all vessel equipment necessary to operate the vessel. The vessel recovered from the second power outage through generator 2, and the fuel supply and booster pumps that supplied fuel to the main engine and generators 1 and 2 automatically restarted after both power outages.

88. At 1:29:15 a.m., the *M/V Dali* struck the Key Bridge.

## The NTSB Investigation

89. The National Transportation Safety Board ("NTSB") was an independent federal agency charged by Congress with investigating civil aviation accidents in the United States and significant events in the other modes of transportation, including maritime casualties.

90. The NTSB conducted an investigation of the *M/V Dali* allision with the Key Bridge. **SYNERGY**, CLASS, and OWNER were parties to the investigation, among others.

91. On or about May 29, 2024, an NTSB investigator interviewed **NAIR** as part of the NTSB's investigation. **NAIR** was in India during the interview, which was conducted by video conference.

92. During the interview, **NAIR** falsely stated that he was unaware of the *M/V Dali*'s operational use of the flushing pump.

93. **NAIR** also falsely stated that the main switchboard was inspected every five years, with the most-recent inspection occurring while the vessel was in drydock in 2020.

94. The fuel supply system on the *M/V Dali* was capable of supplying "marine gas oil" or "marine diesel oil" ("MDO" or "MGO"), very low sulfur fuel oil ("VLSFO"), and Heavy Fuel Oil ("HFO") to its generators. The flushing pump, however, was only capable of pumping the most expensive of those fuels, MGO.

22

95. On May 29, 2024, the NTSB investigator asked **NAIR** about the *M/V Dali*'s use of VLSFO on generators 3 and 4. **NAIR** falsely stated that he was unaware of whether the *M/V Dali* used VLSFO on generators 3 and 4.

96. On or about May 30, 2024, an NTSB investigator interviewed TS 2 by video conference.

97. During his interview, TS 2 falsely stated that he was unaware that the *M/V Maersk Saltoro* and the *M/V Cezanne* each used the flushing pump as the primary fuel supply pump for generators 3 and 4.

### The Conspiracy

98. From in or about 2020 until the present, in the District of Maryland and elsewhere, the defendants,

**SYNERGY MARINE PRIVATE LTD.,
SYNERGY MARITIME PRIVATE LTD., and
RADHAKRISHNAN KARTHIK NAIR,**

did knowingly and willfully combine, conspire, confederate and agree with each other and with other persons known and unknown to the Grand Jury to:

(a) defraud the United States of and concerning its governmental functions and rights, that is, of and concerning its right to have its business and its affairs, and particularly the transaction of the official business of the U.S. Coast Guard, a branch of the U.S. Department of Homeland Security, conducted honestly and impartially, free from fraud, dishonesty, unlawful impairment and obstruction;

(b) commit offenses against the United States, namely, to commit violations of the Ports and Waterways Safety Act, 46 U.S.C. § 70036, by knowingly and willfully failing and causing the failure to immediately notify the nearest U.S. Coast Guard

23

Sector Office that a hazardous condition existed aboard the *M/V Dali, M/V Maersk Saltoro*, and *M/V Cezanne*, which may have adversely affected and adversely affected the safety of the vessel, as well as bridges, structures, and shore areas and the environmental quality of any port, harbor, and navigable waterway of the United States, namely, that the redundant fuel supply system designed to provide fuel to generators 3 and 4 was not used and was not operational, and that the non-redundant flushing pump, was being used instead; and

(c) commit offenses against the United States, namely, to commit violations of 18 U.S.C. § 1001, by knowingly and willfully making materially false statements and using materially false writings in a matter within the jurisdiction of the U.S. Coast Guard and the U.S. Department of Homeland Security, knowing the same to contain materially false, fictitious, and fraudulent entries, namely, false, forged and fictitious inspection certificates certifying that maintenance had been performed on certain electrical equipment onboard the *M/V Dali*, the *M/V Maersk Saltoro*, and the *M/V Cezanne* and creating the overall false impression that the vessels were being operated and maintained properly knowing then and there that the inspections identified in those certificates had not occurred and that the certificates were false, forged and fictitious.

## The Purpose of the Conspiracy

99.     It was the purpose of the conspiracy that **SYNERGY, NAIR,** and its co-conspirators sought to maximize profits and enhance **SYNERGY**'s reputation as a ship manager by avoiding delay, interference, detention, and compliance with the laws designed to protect United States ports and waters.  Specifically, the defendants and their co-conspirators concealed material

24

safety information from regulatory authorities, including the U.S. Coast Guard, the Flag State, CLASS, and CHARTERER, to ensure that **SYNERGY** vessels could do business in U.S. ports and waters without delay, interference, or detention.

### The Manner and Means of the Conspiracy

100. It was part of the conspiracy that the defendants and their co-conspirators operated the *M/V Dali*, *M/V Maersk Saltoro*, and *M/V Cezanne* in U.S. ports and waters without using the redundant fuel supply system for generators 3 and 4.

101. It was part of the conspiracy that defendants and their co-conspirators operated the *M/V Dali*, *M/V Maersk Saltoro*, and *M/V Cezanne* in U.S. ports and waters while using the flushing pump as the fuel supply source for generators 3 and 4 and without notifying the U.S. Coast Guard.

102. It was further part of the conspiracy that the defendants and their co-conspirators, while doing business in U.S. ports and waters, concealed and failed to notify the U.S. Coast Guard of: (1) conditions of class;[2] (2) marine casualties; and (3) hazardous conditions.

103. It was further part of the conspiracy that the defendants and their co-conspirators concealed the use of the flushing pump by omitting and removing any mention of the flushing pump in ship documents, including internal audits conducted by shore-based managers, officer and crew handover notes, officer standing orders, engineering logs, notice of arrival forms submitted to the U.S. Coast Guard, and blackout procedures, checklists and drills.

---

[2] A condition of class is a requirement issued by a classification society requiring that a structural or machinery defect be repaired or that a survey action be taken within a specific timeframe. It indicates that the vessel is temporarily allowed to operate but must fix the deficiency to maintain its class certification.

25

104.    It was further part of the conspiracy that the defendants and their co-conspirators did not seek approval from CLASS or the Flag State, Singapore, to use the flushing pump as the primary fuel supply system for generators 3 and 4 on the *M/V Dali*, *M/V Maersk Saltoro*, and *M/V Cezanne*.

105.    It was further part of the conspiracy that the defendants and their co-conspirators operated the *M/V Dali*, *M/V Maersk Saltoro*, and *M/V Cezanne* in U.S. ports and waters and obtained approval to do so from the U.S. Coast Guard, by presenting and relying on Documents of Compliance and Class approval for the vessels that were based upon the design and use of a fuel supply system that the defendants did not actually use on the vessels.

106.    It was further part of the conspiracy that the defendants and their co-conspirators did not perform a risk assessment to evaluate the risk associated with using the flushing pump as the sole fuel supply pump for generators 3 and 4.

107.    It was further part of the conspiracy that the defendants and their co-conspirators concealed the use of the flushing pump and the inoperability of the redundant supply and booster pumps on the *M/V Dali* by making false and misleading statements to CHARTERER regarding defendants' need to purchase more expensive fuel than would have otherwise been used had they utilized the proper fuel supply system.

108.    It was further part of the conspiracy that the defendants and their co-conspirators made and used, and caused the making and use of, false, forged and fraudulent inspection certificates certifying that maintenance had been performed on certain electrical equipment onboard the *M/V Dali*, the *M/V Maersk Saltoro*, and the *M/V Cezanne*, when such maintenance had not been performed, thus creating the false impression that the vessels were being operated and maintained safely and properly.

26

109.     It was further part of the conspiracy that the defendants and their co-conspirators zip-tied and posted false, forged and fraudulent electrical inspection certificates to the electrical panels in the engine control room, a common area of the *M/V Dali* that was regularly inspected and subject to inspection by the U.S. Coast Guard.

110.     It was part of the conspiracy that the defendants and their co-conspirators submitted to CLASS false, forged, and fictitious testing and inspection certificates certifying that maintenance had been performed on certain electrical equipment onboard the *M/V Dali*, the *M/V Maersk Saltoro*, and the *M/V Cezanne*.

111.     It was further part of the conspiracy that the defendants and their co-conspirators concealed and attempted to conceal the existence of the conspiracy and violations of law.

112.     It was further part of the conspiracy that the defendants and their co-conspirators provided and caused to be provided false documents and false statements to individuals who were investigating the allision.

## Overt Acts in Furtherance of the Conspiracy

113.     In furtherance of the conspiracy, and to effect the objects thereof, at least one of the co-conspirators committed and caused to be committed at least one of the following overt acts, among others, in the District of Maryland, and elsewhere:

Overt Acts related to the Flushing Pump

a.     On or about March 2, 2023, the Chief Engineer on the *M/V Dali*, ("CE 2") created or caused to be created four Chief Engineer's Open-Up Inspection certificates for the fuel supply and booster pumps servicing generators 3 and 4 on the *M/V Dali*. The inspection certificates, which were provided to CLASS as part of a larger Continuous Machinery Confirmatory Survey, stated that the fuel supply and booster

27

pumps were "running satisfactorily." In fact, the fuel supply and booster pumps were not in use and were incapable of being used at that time.

b.  On or about March 3, 2023, CE 2 signed and certified a Chief Engineer's Report for CMS Confirmatory Survey, certifying that "I, the undersigned Chief Engineer of the above ship, carried out 'Open-up Inspection' of the CMS Items and state that the conditions were in order as reported in the attached 'Detail of Open-up Inspection by C/E' (Appendix C-2)."

c.  On or about March 3, 2023, CE 2 provided to CLASS and caused to be provided to CLASS the Chief Engineer's Report for CMS Confirmatory Survey.

d.  On or about March 15, 2023, and as a result of the submission of the Chief Engineer's Report for CMS Confirmatory Survey, **SYNERGY** caused CLASS to issue a Cargo Ship Safety Construction Certificate certifying that the condition of the structure, machinery and equipment was satisfactory and that the vessel complied with the relevant provisions of SOLAS.

e.  At some time between in or around July 2023 and in or around September 2023, **NAIR** removed and caused the removal of any reference to the flushing pump in a Vessel Inspection Report ("VIR") related to an inspection performed by him of the *M/V Dali* in July and August of 2023. **NAIR**'s initial "Internal Audit Findings" listed defects, including "GE MDO MGO pump is noisy need to check on the spares and plan for overhaul." The "GE MDO MGO" pump was a reference to the flushing pump. **NAIR**'s final VIR did not include any reference to the flushing pump.

28

f.  On or about September 19, 2023, the defendants caused the *M/V Dali* to arrive in the Port of Baltimore and failed to notify the U.S. Coast Guard of a hazardous condition, including; that the vessel was relying upon the fuel flushing pump to supply fuel to generators 3 and 4 instead of the approved fuel supply system.

g.  On or about November 4, 2023, a **SYNERGY** Chief Engineer aboard the *M/V Dali*, ("CE 3") took a picture of a draft email with his phone and sent the picture of the draft email to **NAIR** on WhatsApp.  The draft email was intended for CHARTERER as an explanation as to whether the *M/V Dali* could use VLSFO on Generators 3 and 4.  The draft email included the statement that the crew did not know "the condition of the pipings, system and contents" of the approved fuel supply and booster pumps.

h.  On or about November 4, 2023, CE 3 emailed a response to CHARTERER.  The statement that the crew was unaware of "the condition of the pipings, system and contents" of the approved fuel supply and booster pumps had been removed. Instead, the email stated that the fuel supply system was "isolated."  CE 3 copied **NAIR** on the email.

i.  On or about December 12, 2023, the defendants caused the *M/V Cezanne* to arrive in the Port of Baltimore and failed to notify the U.S. Coast Guard of a hazardous condition, including that the vessel was relying upon the fuel flushing pump to supply fuel to generators 3 and 4 instead of the approved fuel supply system.

j.  On or about December 20, 2023, the defendants caused the *M/V Dali* to arrive in the Port of Baltimore and failed to notify the U.S. Coast Guard of a hazardous

29

condition, including that the *M/V Dali* was relying upon the fuel flushing pump to supply fuel to generators 3 and 4 instead of the approved fuel supply system.

k.   On or about January 23, 2024, CE 3 called **NAIR** after receiving an email from CHARTERER asking why the *M/V Dali* was not consuming VLSFO.

l.   On or about January 23, 2024, CE 3 emailed CHARTERER stating that the fuel supply system was not in use following a "piping modification" and that generators 3 and 4 were "permanently" using MGO.  CE 3 copied **NAIR** on the email.

m.   On or about March 23, 2024, the defendants caused the *M/V Dali* to arrive in the Port of Baltimore and failed to notify the U.S. Coast Guard of a hazardous condition, including that the *M/V Dali* was relying upon the fuel flushing pump to supply fuel to generators 3 and 4 instead of the approved fuel supply system.

n.   On or about March 26, 2024, **SYNERGY** caused the *M/V Dali* to depart from the Seagirt Terminal in the Port of Baltimore without notifying the U.S. Coast Guard or otherwise complying with **SYNERGY**'s SMS regarding the losses of power occurring in port on March 25, 2024.

o.   On or about March 26, 2024, the defendants caused the *M/V Dali* to depart the Port of Baltimore and failed to notify the U.S. Coast Guard of a hazardous condition, including that the *M/V Dali* was relying upon the fuel flushing pump to supply fuel to generators 3 and 4 instead of the approved fuel supply system.

p.   On or about May 29, 2024, **NAIR** made false and misleading statements to an NTSB investigator about his knowledge of the use of the flushing pump on the *M/V Dali.*

30

q. On or about May 29, 2024, **NAIR** falsely told an NTSB investigator that he was not aware of whether VLSFO was used for the *M/V Dali*'s generators 3 and 4.

r. On or about May 30, 2024, TS 2 falsely told an NTSB investigator that he was not aware that the *M/V Maersk Saltoro* and *M/V Cezanne*'s use of the flushing pump to supply fuel to generators 3 and 4 prior to the allision.

Overt Acts related to the False Electrical Certificates

s. On or about March 28, 2020, **NAIR** and another agent of **SYNERGY** ("AGENT 1"), procured and attempted to procure false inspection certificates stating that the vacuum circuit breakers ("VCB") and air circuit breakers ("ACB") located in the Main Switchboard aboard the *M/V Dali* had been inspected and tested, when, in fact, the VCBs and ACBs had not been inspected.

t. On or about March 28, 2020, **NAIR** sent a message to AGENT 1 through WeChat[3] stating, "If possible discuss with yard if they can just provide with a certificate (no need to do actual test) of test carried out to submit to class. You can just check and negotiate for say some 100 USD for the certificate. Please try and convince yard."

u. On or about April 8, 2020, **NAIR** sent AGENT 1 a photograph of an email from a vendor who was asked to provide false electrical certificates to **NAIR**, among others. The email stated, "You should know that issue the certificate without actual test is base on the trust, it is a risk if the ACBs have issue in the future. My company doesn't allow to issue the certificate under this situation."

---

[3] WeChat is an electronic messaging application.

v.  On or about April 16, 2020, AGENT 1 sent a WeChat message to **NAIR** stating, "Any news for ACB [t]est?"

w.  On or about April 16, 2020, **NAIR** responded to the preceding text, stating, "The report will be given onboard today[.]"

x.  At some point following the delivery of the false certificates, **SYNERGY** zip-tied the false circuit breaker inspection certificates to the panels on the Main Switchboard of the *M/V Dali*.

y.  On or about May 28, 2020, **NAIR** emailed the false circuit breaker inspection certificates to CLASS.  The inspection certificates included an inspection date of April 12, 2020.

z.  On or about June 1, 2020, **NAIR** forwarded his May 28, 2020, email to CLASS, with the attachments, to TS 2.

aa. On or about July 19, 2020, TS 2 sent an email to a foreign company requesting that the same false and fabricated VCB and ACB certificates used for the *M/V Dali* be issued for the *M/V Maersk Saltoro*.

bb. On or about May 29, 2024, **NAIR** falsely told an NTSB investigator that the main switchboard was inspected in drydock in 2020.

cc. On or about June 6, 2024, **SYNERGY** electronically shared and submitted to the NTSB the false VCB and ACB inspection certificates for the *M/V Dali*.

dd. On or about October 18, 2024, **SYNERGY**, through counsel, provided false inspection certificates for the VCBs servicing generators 1 through 4 and the bow thruster on the *M/V Dali* to a Federal Grand Jury in Baltimore, Maryland.

32

ee. On or about March 23, 2025, **SYNERGY**, through counsel, provided false inspection certificates for the VCBs servicing generators 1 through 4 and the bow thruster on the *M/V Maersk Saltoro* and on the *M/V Cezanne* to a Federal Grand Jury in Baltimore, Maryland.

Other Overt Acts

ff. On or about October 17, 2022, TS 2 instructed a **SYNERGY** employee to create a false and fabricated bow thruster inspection certificate for the *M/V Cezanne*, falsely indicating that the bow thruster had been serviced when it had not. TS 2 provided the employee with a copy of the bow thruster inspection certificate from other vessels to copy.

gg. On or about October 17, 2022, TS 2 instructed a **SYNERGY** employee to create a false and fabricated technical inspection report for the steering gears on the *M/V Cezanne*, falsely indicating that the steering gears had been inspected and repaired when they had not been inspected or repaired. TS 2 provided the employee with a copy of a technical inspection report from other vessels to copy.

hh. On or about December 20, 2023, the defendants failed to notify the Port of Baltimore and the U.S. Coast Guard of a condition of class imposed by CLASS related to the scrubber sensor on the *M/V Dali*.

18 U.S.C. § 371

33

## COUNTS TWO THROUGH FOUR
### (Ports & Waterways Safety Act – Failure to Report a Hazardous Condition)

1.      The allegations contained in paragraphs 1 through 97 and 99 through 113 of Count One are realleged and incorporated by reference as though fully set forth herein.

2.      On or about the dates set forth in the table below, with each date constituting a count, in the Port of Baltimore and within the District of Maryland, the defendants,

**SYNERGY MARINE PRIVATE LTD.,**
**SYNERGY MARITIME PRIVATE LTD., and**
**RADHAKRISHNAN KARTHIK NAIR,**

knowingly and willfully failed and caused the failure to immediately notify the U.S. Coast Guard that a hazardous condition existed aboard the *M/V Dali* that may have adversely affected the safety of the vessel, as well as bridges, structures, and shore area, and the environmental quality of ports, harbors, and navigable waterways of the United States.  Specifically, the defendants willfully and knowingly failed to notify the U.S. Coast Guard (1) that the supply and booster pumps designed to provide fuel for generators 3 and 4 were not being used; and (2) that the flushing pump was being used as the sole fuel supply for generators 3 and 4.

| COUNT | DATE | LOCATION |
|---|---|---|
| 2 | 09/19/23 | Port of Baltimore |
| 3 | 12/20/23 | Port of Baltimore |
| 4 | 03/23/24 | Port of Baltimore |

46 U.S.C. § 70036(b)(1)
18 U.S.C. § 2

34

## COUNTS FIVE THROUGH TEN
### (Misconduct or Neglect of Ship Officers Resulting in Death)

1.      The allegations contained in paragraphs 1 through 97 and 99 through 113 of Count One are realleged and incorporated by reference as though fully set forth herein.

2.      On or about March 25, 2024, and March 26, 2024, in the Port of Baltimore and the District of Maryland and elsewhere, the defendants,

**SYNERGY MARINE PRIVATE LTD.,**
**SYNERGY MARITIME PRIVATE LTD., and**
**RADHAKRISHNAN KARTHIK NAIR,**

engaged in gross negligence, willful misconduct, violations of law, and gross inattention to the duties onboard and with regard to the *M/V Dali*, that destroyed and caused the destruction of human life of six individuals each comprising a separate count of this indictment and identified here as:

| COUNT | VICTIM |
|-------|--------|
| 5 | Individual 1 |
| 6 | Individual 2 |
| 7 | Individual 3 |
| 8 | Individual 4 |
| 9 | Individual 5 |
| 10 | Individual 6 |

3.      The following conditions caused the life of the individuals to be destroyed:

a.   The failure to notify the U.S. Coast Guard: (1) that the supply and booster pumps designed to provide fuel for generators 3 and 4 were not being used on the *M/V*

*Dali*; and (2) that the flushing pump was being used as the sole fuel supply for generators 3 and 4 on the *M/V Dali*;

b. The failure to adequately train the officers and crew of the *M/V Dali*;

c. The failure to implement proper blackout procedures, checklists, and drills on the *M/V Dali*;

d. The failure to perform a risk assessment concerning the use of the flushing pump as the sole method of supplying fuel to generators 3 and 4 on the *M/V Dali*;

e. The failure to notify CLASS that the *M/V Dali* sailed in protected waters using the flushing pump as the sole method of supplying fuel to generators 3 and 4;

f. The failure to notify the Flag State, Singapore, that the *M/V Dali* sailed in protected waters while relying on the flushing pump as the sole method of supplying fuel to generators 3 and 4;

g. The failure to investigate, document, and report two blackouts that occurred on the *M/V Dali* on or about March 25, 2024;

h. The failure to comply with the **SYNERGY** Safety Management System following the *M/V Dali*'s dual-blackout on March 25, 2024;

i. The failure to conduct an adequate Master/Pilot Exchange, including concealing and failing to inform the pilots of the fact that the non-redundant flushing pump was being used as the sole fuel supply source for generators 3 and 4 on the *M/V Dali*; and

36

j.   The failure to conduct an adequate Master/Pilot Exchange, including concealing

and failing to inform the pilots of the fact that a dual-blackout occurred on the *M/V*

*Dali* on March 25, 2024.

18 U.S.C. § 1115
18 U.S.C. § 2

## COUNT ELEVEN
### (Obstruction of an Agency Proceeding)

1.      The allegations contained in paragraphs 1 through 97 and 99 through 113 of Count One are realleged and incorporated by reference as though fully set forth herein.

2.      On or about May 29, 2024, in the District of Maryland and elsewhere, the defendants,

**SYNERGY MARINE PRIVATE LTD.,
SYNERGY MARITIME PRIVATE LTD., and
RADHAKRISHNAN KARTHIK NAIR,**

did corruptly influence, obstruct, and impede the due and proper administration of law in a pending proceeding before the National Transportation Safety Board ("NTSB"), by making false and misleading statements during **NAIR**'s testimony to NTSB investigators and Parties during the casualty investigation of the *M/V Dali* allision with the Key Bridge. Specifically:

      a.  **NAIR** stated he was unaware whether generators 3 and 4 on the *M/V Dali* were running on VLSFO or not.

      b.  **NAIR** stated he was not aware of the flushing pump's operational use on the *M/V Dali* prior to the allision.

      c.  When asked about maintenance on the HV Switchboard, specifically the inspections indicated on certificates that were zip-tied to the panels of the HV Switchboard, **NAIR** stated that the VCBs were inspected in drydock in 2020.

18 U.S.C. § 1505
18 U.S.C. § 2

38

## COUNT TWELVE
### (Obstruction of an Agency Proceeding)

1.      The allegations contained in paragraphs 1 through 97 and 99 through 113 of Count One are realleged and incorporated by reference as though fully set forth herein.

2.      On or about June 6, 2024, in the District of Maryland and elsewhere, the defendants,

**SYNERGY MARINE PRIVATE LTD.,
SYNERGY MARITIME PRIVATE LTD., and
RADHAKRISHNAN KARTHIK NAIR,**

did corruptly influence, obstruct, and impede the due and proper administration of law in a pending proceeding before the National Transportation Safety Board ("NTSB"), by providing to the NTSB falsified documents and information, namely:

   a.  Vacuum Circuit Breaker inspection certificates for *M/V Dali* generators 1, 2, 3, and 4;

   b.  Air Circuit Breaker Inspection Report for the emergency generator; and

   c.  Vacuum Circuit Breaker inspection certificates for the bow thruster.

18 U.S.C. § 1505
18 U.S.C. § 2

39

## COUNTS THIRTEEN THROUGH FIFTEEN
### (False Statements)

1.      The allegations contained in paragraphs 1 through 97 and 99 through 113 of Count One are realleged and incorporated by reference as though fully set forth herein.

2.      On or about the dates set forth below, in the District of Maryland and elsewhere, the defendants,

**SYNERGY MARINE PTE LTD.,**
**SYNERGY MARITIME PTE LTD., and**
**RADHAKRISHNAN KARTHIK NAIR,**

did willfully and knowingly make and use a false writing and document, knowing the same to contain materially false, fictitious, and fraudulent statement and entry in a matter within the jurisdiction of the executive branch of the Government of the United States, well knowing and believing that the documents supplied had been falsified and fabricated, and the safety inspections stated as having occurred therein did not, in fact, occur.

| COUNT | DATE | USE OF THE FALSE DOCUMENT |
|---|---|---|
| 13 | March 23, 2024 | The *M/V Dali* arrived in the Port of Baltimore with false inspection certificates for the Vacuum Circuit Breakers servicing generators 1 through 4 and the bow thruster zip-tied to the switchboard cabinet. |
| 14 | June 6, 2024 | The defendants provided false inspection certificates for the Vacuum Circuit Breakers servicing generators 1 through 4 and the bow thruster on the *M/V Dali* to the NTSB, which was conducting an investigation into the allision involving the *M/V Dali* and the Key Bridge. |
| 15 | October 18, 2024 | The defendants, through counsel, provided false inspection certificates for the Vacuum Circuit Breakers servicing generators 1 through 4 and the bow thruster on the *M/V Dali* to a Federal Grand Jury in Baltimore. |

18 U.S.C. § 1001
18 U.S.C. § 2

40

## COUNT SIXTEEN
### (Clean Water Act – Discharge of Pollutants)

1.      The allegations contained in paragraphs 1 through 97 and 99 through 113 of Count One and paragraph 3 of Counts Five through Ten are realleged and incorporated by reference as though fully set forth herein.

2.      On or about March 26, 2024, in the District of Maryland and elsewhere, the defendants,

**SYNERGY MARINE PRIVATE LTD. and
SYNERGY MARITIME PRIVATE LTD.,**

did negligently discharge and cause the discharge of pollutants from a point source, namely the *M/V Dali*, into and upon the navigable waters of the United States without a permit issued under the National Pollution Discharge Elimination System. Specifically, on or about March 26, 2024, the defendants caused pollutants to be discharged from the *M/V Dali* into the Patapsco River by acting negligently in one or more of the following ways:

a.  Failing to notify the U.S. Coast Guard: (1) that the supply and booster pumps designed to provide fuel for generators 3 and 4 were not being used on the *M/V Dali*; and (2) that the flushing pump was being used as the sole fuel supply for generators 3 and 4 on the *M/V Dali*;

b.  Failing to adequately train the officers and crew of the *M/V Dali*;

c.  Failing to implement proper blackout procedures, checklists, and drills on the *M/V Dali*;

d.  Failing to perform a risk assessment concerning the use of the flushing pump as the sole method of supplying fuel to generators 3 and 4 on the *M/V Dali*;

41

e. Failing to notify CLASS that the *M/V Dali* sailed in protected waters using the flushing pump as the sole method of supplying fuel to generators 3 and 4;

f. Failing to notify the Flag State, Singapore, that the *M/V Dali* sailed in protected waters while relying on the flushing pump as the sole method of supplying fuel to generators 3 and 4;

g. Failing to investigate, document, and report two blackouts that occurred on the *M/V Dali* on or about March 25, 2024;

h. Failing to comply with the **SYNERGY** Safety Management System following the *M/V Dali*'s dual-blackout on March 25, 2024;

i. Failing to conduct an adequate Master/Pilot Exchange, including concealing and failing to inform the pilots of the fact that the non-redundant flushing pump was being used as the sole fuel supply source for generators 3 and 4 on the *M/V Dali*; and

j. Failing to conduct an adequate Master/Pilot Exchange, including concealing and failing to inform the pilots of the fact that a dual-blackout occurred on the *M/V Dali* on March 25, 2024.

33 U.S.C. §§ 1311, 1319
18 U.S.C. § 2

## COUNT SEVENTEEN
### (Clean Water Act – Discharge of Harmful Quantity of Oil)

1.      The allegations contained in paragraphs 1 through 97 and 99 through 113 of Count One and paragraph 3 of Counts Five through Ten are realleged and incorporated by reference as though fully set forth herein.

2.      On or about March 26, 2024, in the District of Maryland and elsewhere, the defendants,

**SYNERGY MARINE PRIVATE LTD. and**
**SYNERGY MARITIME PRIVATE LTD.,**

did negligently discharge and cause the discharge of pollutants from a point source, namely the *M/V Dali*, into and upon the navigable waters of the United States without a permit issued under the National Pollution Discharge Elimination System. Specifically, on or about March 26, 2024, the defendants caused a harmful quantity of oil to be discharged from the *M/V Dali* into the Patapsco River by acting negligently in one or more of the following ways:

   a. Failing to notify the U.S. Coast Guard: (1) that the supply and booster pumps designed to provide fuel for generators 3 and 4 were not being used on the *M/V Dali*; and (2) that the flushing pump was being used as the sole fuel supply for generators 3 and 4 on the *M/V Dali*;

   b. Failing to adequately train the officers and crew of the *M/V Dali*;

   c. Failing to implement proper blackout procedures, checklists, and drills on the *M/V Dali*;

   d. Failing to perform a risk assessment concerning the use of the flushing pump as the sole method of supplying fuel to generators 3 and 4 on the *M/V Dali*;

43

e.  Failing to notify CLASS that the *M/V Dali* sailed in protected waters using the flushing pump as the sole method of supplying fuel to generators 3 and 4;

f.  Failing to notify the Flag State, Singapore, that the *M/V Dali* sailed in protected waters while relying on the flushing pump as the sole method of supplying fuel to generators 3 and 4;

g.  Failing to investigate, document, and report two blackouts that occurred on the *M/V Dali* on or about March 25, 2024;

h.  Failing to comply with the **SYNERGY** Safety Management System following the *M/V Dali*'s dual-blackout on March 25, 2024;

i.  Failing to conduct an adequate Master/Pilot Exchange, including concealing and failing to inform the pilots of the fact that the non-redundant flushing pump was being used as the sole fuel supply source for generators 3 and 4 on the *M/V Dali*; and

j.  Failing to conduct an adequate Master/Pilot Exchange, including concealing and failing to inform the pilots of the fact that a dual-blackout occurred on the *M/V Dali* on March 25, 2024.

33 U.S.C. §§ 1319, 1321
18 U.S.C. § 2

44

## COUNT EIGHTEEN
### (Discharge of Refuse)

1.      The allegations contained in paragraphs 1 through 97 and 99 through 113 of Count One and paragraph 3 of Counts Five through Ten are realleged and incorporated by reference as though fully set forth herein.

2.      On or about March 26, 2024, in the District of Maryland and elsewhere, the defendants,

**SYNERGY MARINE PRIVATE LTD. and
SYNERGY MARITIME PRIVATE LTD.,**

discharged and deposited, and caused to be discharged and deposited, refuse and pollutants, caused by the *M/V Dali* allision with and destruction of the Key Bridge, including at least 16,000 tons of steel, 10,000 tons of concrete, and 7 vehicles, into the Patapsco River, a navigable water, without a permit issued by the Army Corps of Engineers.

33 U.S.C. §§ 407, 411
18 U.S.C. § 2

## <u>SENTENCING ALLEGATION</u>

1.    With respect to the charges alleged in this Indictment, and for the purposes of determining the maximum alternative fine of twice the gross pecuniary losses to persons other than the defendant, pursuant Title 18, United States Code, Section 3571(d), the defendants caused at least approximately $5 billion in gross pecuniary losses to persons.

## FORFEITURE ALLEGATION

The Grand Jury for the District of Maryland further finds that:

1.      Pursuant to Federal Rule of Criminal Procedure 32.2, notice is hereby given to the defendants that the United States will seek forfeiture as part of any sentence in accordance with 33 U.S.C. § 412 in the event of the defendants' conviction under Count Eighteen of this Indictment.

### Obstructing Navigable Waterways Forfeiture

2.      Upon conviction of the offense alleged in Count Eighteen of this Indictment, the defendants,

**SYNERGY MARINE PRIVATE LTD. and
SYNERGY MARITIME PRIVATE LTD.**,

shall be liable, pursuant to 33 U.S.C. § 412, for the pecuniary penalties specified in section 411 of this title, and in addition thereto for the amount of the damages done by said boat, vessel, scow, raft, or other craft, which latter sum shall be placed to the credit of the appropriation for the improvement of the harbor or waterway in which the damage occurred, and said boat, vessel, scow, raft, or other craft may be proceeded against summarily by way of libel in any district court of the United States having jurisdiction thereof.

Kelly O. Hayes /mpp
Kelly O. Hayes
United States Attorney

by Leigh P. Rende
for:
Adam R. F. Gustafson
Principal Deputy Assistant Attorney
Environment & Natural Resources Division

A TRUE BILL:

**SIGNATURE REDACTED**

Foreperson

Date: 4/8/26

47