**UNITED STATES DISTRICT COURT**
**DISTRICT OF MARYLAND**

| | |
|---|---|
| UNITED STATES OF AMERICA<br>v.<br>SYNERGY MARINE PRIVATE LTD., *et al.* | Case No. 26-CR-00118-JKB |

**DECLARATION OF WILLIAM R. BENNETT, III**

I, **WILLIAM R. BENNETT, III**, pursuant to 28 U.S.C. § 1746, declare as follows:

1. I am a Partner at the law firm of Blank Rome LLP ("Blank Rome"), with offices at 1271 Avenue of the Americas, New York, New York 10120.

2. I submit this Declaration in support of Synergy Marine Private Ltd. ("Synergy Marine") and Synergy Maritime Private Ltd.'s ("Synergy Maritime") (collectively the "Synergy Defendants") Opposition to the Government's Motion for a Hearing to Evaluate Potential Conflicts of Interest (the "Motion"). *See* ECF No. 75.

3. I obtained a Bachelor of Engineering in Naval Architecture (ship design) from the State University of New York at Maritime College, along with an Unlimited Third Mate's License issued by the U.S. Coast Guard ("USCG"), which allowed me to sail as a Third Officer on any vessel, of any size, upon any ocean. Immediately following graduation, I was employed as a Third Officer aboard an ocean-going oil tanker. My career at sea included working aboard various types of vessels, including oil tankers, offshore supply vessels, a dredge, and a yacht. I held the position of Second Mate aboard the offshore supply vessel and Master of the yacht. In total, I have over 730 days at sea.

4. Following my seagoing career, I attained a law degree from St. John's Law School in New York. I have been practicing maritime law for nearly 34 years and have been with Blank Rome since 2013.

5. During my legal career I have represented vessel and crew interests in many significant and high-profile maritime casualties, including, but not limited to, the allision of the Staten Island Ferry BARBIERI with a pier in which 11 people died and numerous others were injured; the allision by the fast ferry SEASTREAK WALL STREET with a pier that resulted in injuries to more than 50 passengers; and the sinking of the EL FARO, which resulted in the deaths of 28 crew members and 5 contractors.

6. Most, if not all, of these casualties have involved investigations by the USCG and/or the National Transportation Safety Board ("NTSB"), in addition to any resulting litigation. My experience with USCG and NTSB investigations is substantial.

7. I am Blank Rome's relationship partner for this case and other related matters described below, and I am familiar with all aspects of those matters.

8. I am admitted *pro hac vice* to practice before this Court as counsel for the Synergy Defendants in the above-captioned matter, and for Synergy Marine and Grace Ocean Private Limited ("Grace Ocean") (collectively, the "Vessel Interests") in the related Limitation Action, Civil Case No. 24-cv-941 (JKB). I am lead counsel in both matters.

9. I was specifically retained, along with Blank Rome's maritime practice, because of my extensive experience representing vessel interests in consequential marine casualties and Blank Rome's well-known and highly regarded maritime legal capabilities. Blank Rome's maritime practice group includes six former USCG officers, three former merchant mariners, and two naval officers. Together, these attorneys have experience with most aspects of deck and

engine operations. Our practice group also has other attorneys with decades of on-the-job experience in maritime law. Collectively, the attorneys in our practice group have hundreds of years of experience in maritime matters. My colleagues also have handled significant casualty matters, including the collision between the USS JOHN S. MCCAIN and the tanker vessel ALNIC MC, which resulted in the deaths of 10 sailors, and the sinking of the STRETCH DUCK 7, which sank with 31 passengers on board, 17 of whom died. Blank Rome's maritime group also has handled countless maritime criminal cases involving the Ports and Waterways Safety Act ("PWSA"), the Seaman's Manslaughter Statute, and other federal maritime statutes. We also routinely counsel clients on compliance with statutory and regulatory requirements.

10. I have reviewed all of the papers filed in connection with the Motion. The statements made in this Declaration are based upon my personal knowledge, my review of my personal notes, as well as the results of searches of emails and Outlook meeting notices involving Karthik Nair ("Nair") and/or [redacted] (the individual referred to in the Superseding Indictment as "TS 2") conducted by my colleagues in response to the Motion.[1]

11. I was engaged to represent the Vessel Interests in the early morning of March 26, 2024, immediately following the M/V DALI's (the "Vessel") allision with the Francis Scott Key Bridge (the "Allision"). Once engaged, I selected a team of attorneys to attend the initial response, and we were on the Vessel within a matter of hours.

12. Since that time, Blank Rome has represented the Synergy Defendants in all legal proceedings flowing from the Allision, including the investigations conducted by the NTSB and USCG, the Limitation Action, the criminal investigation and this action, and proceedings against the Vessel's manufacturer, Hyundai Heavy Industries ("HHI"). Blank Rome also has represented

[1] Blank Rome conducted a thorough search for records to prepare this Declaration, the Declaration of Alan Weigel, and the Opposition to the Motion.

Grace Ocean in the NTSB and USCG investigations, the Limitation Action, and the proceedings against HHI. Over twenty Blank Rome attorneys have worked on various aspects of these matters since March 2024.

13. Blank Rome does not represent and has never represented either Karthik Nair or TS 2. Blank Rome does not have a written engagement letter with either of these individuals. None of the attorneys on my team has indicated to Nair or TS 2 that Blank Rome represents them. Attorneys from Blank Rome gave both Nair and TS 2 multiple *Upjohn* warnings.

14. Notwithstanding Blank Rome's deep involvement in the case, including *dozens of meetings* with the Government over the last two-and-a-half years, the Government did not raise the issue of a potential conflict until *June 11, 2026*. Specifically, on a June 11, 2026 telephone call, Matthew Phelps told my colleague, and a member of my team, Joseph G. Poluka, about the Government's conflict theory and Phelps stated the Government would send a formal letter. The Government then raised the issue during a sidebar at the June 16, 2026, status conference, before sending a letter. We received the letter later that same day. *See* Exhibit 1. Blank Rome responded to the letter on June 26, 2026, and had a conference call with the Government concerning its conflict allegations on June 30, 2026. During the call, the Government advised that it was still considering whether to file a motion and likely would not do so for a few weeks. The Motion, however, was not filed until August 11, 2026.

15. The Government's Motion seized upon Blank Rome's reference to an "internal investigation" in the correspondence exchanged prior to the Motion. To be clear, Blank Rome was not engaged to conduct an internal investigation; rather, we used that term in our letter to the Government to describe our work to learn facts regarding our clients' cases.

**The NTSB Investigation**

16. When the NTSB investigates a marine casualty, stakeholders that were "involved in the accident and that can provide suitable qualified technical personnel to actively assist in the investigation" may be designated as parties. 49 C.F.R. § 831.11(a). In marine investigations, the U.S. Coast Guard is the only entity that has a right to participate. § 831.61(a)(2).

17. Each party may have "party representatives," as needed based on the nature of the investigation. Party representatives may not "(i) occupy a legal position; or (ii) be a person who represents claimants or insurers." §§ 831.11(b)(1), 831.61(a)(4).

18. The NTSB has the power to revoke party status if a party, or its party representatives, do not comply with instructions, withhold information, or otherwise disrupt the proceedings. §§ 831.11(a)(4), 831.61(a)(5).

19. Party representatives must sign a party agreement accepting the responsibilities and restrictions set forth therein, which include following the rule regarding the involvement of counsel. §§ 831.11(d), 831.61(c).

20. Both Synergy Marine and Grace Ocean were parties to the NTSB investigation regarding the Allision.

21. The NTSB investigation of the Allision was divided into multiple "working groups" by subject area and parties participated in working groups relevant to their role in the Allision. For example, Synergy Marine and Grace Ocean were both in the "Engineering" working group because they could provide party representatives with technical knowledge of the Vessel's engine room and equipment, but they were not in the "Bridge Protection Systems" working group, which concerned the Francis Scott Key Bridge.

22. "Party representatives" participate in witness interviews conducted by NTSB; however, each interviewee is entitled to have one "representatives of [his or her] choosing," which "(1) may be an attorney; (2) may provide support and counsel to the witness; (3) may not supplement the witness's testimony; and (4) may not advocate for the interests of a witness's other affiliations." *See* §§ 831.7, 831.57. Representatives acting contrary to these requirements may be removed. *Id.*

23. Based upon my extensive experience representing parties involved in NTSB investigations, I was aware that Blank Rome was not permitted to represent or substantively prepare any individual employees for their NTSB interviews. I ensured that my team was aware of these restrictions immediately after our engagement on behalf of the Vessel Interests, particularly because impermissible involvement by counsel could have resulted in Synergy Marine and Grace Ocean being barred from participating in the NTSB investigation.

24. The NTSB was fully aware that Blank Rome represented Synergy Marine and Grace Ocean in connection with its investigation, and that it did not represent any of the crew members or shoreside individuals. Blank Rome attorneys, including myself, had extensive interaction with NTSB during the shipboard investigation, and we helped our clients to cooperate in the investigation by facilitating the production of records requested by NTSB and ensuring that they fully responded to technical questions from NTSB investigators.

25. On or about April 23, 2024, we learned that NTSB wanted to interview Nair and TS 2. On April 26, my colleague, Alan Weigel, and I had a call with Synergy Marine's in-house counsel and managing director regarding the status of the NTSB investigation. Nair joined for a portion of the call that concerned NTSB's interview request. Weigel and I told Nair that NTSB requested to interview him and asked whether he would be able to attend in person or remotely.

26. On May 20, Barton Barnum of the NTSB emailed Synergy Marine's Party Coordinator to indicate that the Engineering Group wanted to interview Nair and TS 2 soon, ideally that week. NTSB did not contact me or anyone else from Blank Rome to coordinate these interviews. Virtual interviews via Microsoft Teams were subsequently set for Nair and TS 2 on May 29 and May 30, 2024, respectively.

27. Because the NTSB interviews were foreign legal proceedings with which Synergy Marine, Nair, and TS 2 were unfamiliar, I recommended that a Blank Rome attorney serve as the "representative" for the interviewees. This did not mean that Blank Rome would serve as counsel for the interviewees, only that one of our attorneys would serve as the representative permitted to attend under 49 C.F.R. § 831.57(a). Synergy Marine and the individuals agreed with this proposal, and I asked Weigel to participate.

28. As detailed in the Declaration of Alan Weigel ("Weigel Declaration"), Weigel briefly met with Nair on May 28, 2024, and attended his NTSB interview on May 29, 2024. Weigel also briefly met with TS 2 on May 29, 2024, and attended his NTSB interview on May 30, 2024. These meetings and the NTSB interviews were conducted over Microsoft Teams.

29. Regarding Weigel's meetings with Nair and TS 2, I note that a statement in Blank Rome's June 26, 2026 response to the Government's June 16, 2026 letter requires clarification. Our letter stated that "Our records reflect that Blank Rome attorneys only conducted one substantive interview of Mr. Nair and [redacted] prior to their NTSB interviews and that there were no direct emails with either individual—only emails to groups of Synergy personnel relating to requests for documents on which they may have been copied." In preparing our opposition and supporting declarations, we discovered that this statement is not entirely accurate. That statement was made based on the recollection of my colleagues at the time. However, the

attorneys on my team have since thoroughly reviewed their notes and memoranda, as well as emails and Microsoft Outlook meeting files. As discussed in the Weigel Declaration, Weigel briefly met with Nair and TS 2 prior to their NTSB interviews to provide an overview of the proceedings and explain the best practices for answering questions and only had limited discussion of substantive matters. These meetings were *not* "substantive interviews."[2] In addition, we also discovered a small set of direct emails between Weigel and Nair and TS 2, which are described in the Weigel Declaration, and some of which concerned matters entirely unrelated to the legal proceedings arising out of the Allision.

30. To the best of my knowledge, the Government was fully aware of the NTSB's interviews of Nair and TS 2 since at least the early summer of 2024 (more than two years prior to its Motion) and could have had or did have access the transcripts from the NTSB at any point thereafter.

31. With respect to document production to the NTSB during the investigation, it is my understanding that both Blank Rome and Synergy Marine directly produced records to NTSB during its shipboard investigation. This was done on a somewhat *ad hoc* basis, based on NTSB's specific requests. Blank Rome also reached an agreement with NTSB's counsel concerning the scope of electronic records collection and production, including with respect to custodians and search terms, and all records falling within the agreed scope were produced.

[2] Indeed, in TS 2's deposition, he was asked if he met with Weigel to prepare for the NTSB interview, to which he answered yes. When asked what he did to prepare, TS 2 stated "I did not do anything." Based upon a follow-up question of "Not much?" TS 2 stated, "Not much." This portion of the transcript was not included in the Government's exhibit at ECF 75-10, and that page is attached hereto as Exhibit 2. Ex. 2 at 39:25-40:17.

**The Criminal Investigation**

32. Blank Rome learned that the Government had initiated a criminal investigation regarding the Allision on April 15, 2024, when the FBI and other federal law enforcement agencies executed a search warrant on the Vessel.

33. Following execution of the search warrant, Blank Rome's immediate discussions with the Government concerned the seizure of crew property and protecting privileged communications contained on the Vessel's computers. In the weeks that followed, the Government requested that Synergy Marine and Grace Ocean enter into a *voluntary* Security Agreement, to allow for the crew to remain in Baltimore when the Vessel traveled to Norfolk, Virginia for temporary repairs. The Government requested a *voluntary* Security Agreement because U.S. Customs and Border Protection ("CBP") could not withhold the Vessel's departure clearance based on the violations alleged at that time and there was no basis for demanding a Security Agreement in exchange for release of the Vessel. To the best of my and my colleagues' knowledge, such a voluntary agreement would have been unprecedented. Neither Synergy Marine nor Grace Ocean agreed to the Government's proposal.

34. On May 21, 2024, Synergy Marine received its first grand jury subpoena. This subpoena was received at the same time the Vessel was being moved to a berth, the NTSB was seeking to schedule the Nair and TS 2 interviews, and Blank Rome was working on NTSB's records requests. Moreover, because the subpoena was extremely broad, Blank Rome spent several weeks negotiating the scope of the subpoena. Blank Rome did not do a subpoena-specific records collection immediately upon receipt of the subpoena; rather, we agreed to produce to the Government all of the documents produced to NTSB and the civil claimants to date as a priority, while continuing our discussion of the subpoena's scope.

35. Later, in June 2024, just before the Vessel traveled to Norfolk, the Government expanded its theory to include an alleged violation of the PWSA, which provided a basis for the USCG to request that CBP withhold the Vessel's departure clearance and demand a Security Agreement in exchange for release of the Vessel. *See, e.g.*, 46 U.S.C. § 70036(f). Therefore, Synergy Marine and Grace Ocean were required to enter a Security Agreement and maintain the crew members listed in the agreement in Baltimore to facilitate the Government's investigation. The agreement was dated June 18, 2024.

36. As the case progressed, Synergy Marine appointed a records custodian and moved forward with an extensive collection of electronic and hard copy records, including electronic records from email and file servers, shared files, and mobile phones. This was all done in coordination with the Synergy Defendants' records custodian and an e-discovery vendor. The records collection process was consistent with standard practices in large corporate matters. In general, Blank Rome attorneys did not speak directly with the individuals whose data was being collected (including Nair and TS2) prior to the collection—that was handled by the records custodian. There were a few limited circumstances where Blank Rome facilitated the introduction of Synergy Defendant employees to the e-discovery vendor prior to collection. Overall, the Synergy Defendants produced over 300 thousand documents pursuant to grand jury subpoenas.

37. The Government made numerous inquiries regarding the records collection process in this matter. Blank Rome responded to some of these inquiries and the records custodian provided a declaration, sat for two proffer sessions, and testified before the Grand Jury regarding the records collection process and the Synergy Defendants' corporate records generally. To the best of my knowledge, the Government never asked the records custodian about the allegedly false air circuit breaker ("ACB") and vacuum circuit breaker ("VCB") inspection certificates referenced

in the Superseding Indictment or whether Blank Rome spoke to Nair or TS 2 in connection with records collection (which we did not).

38. Blank Rome did not speak with Nair or TS 2 regarding the allegedly false ACB and VCB documents and related documents and correspondence before those records were produced to the NTSB and the Grand Jury.

39. In total, the Synergy Defendants received 17 grand jury subpoenas (excluding subpoenas that were legally defective and, therefore, not accepted). Because of the substantial number of custodians and significant data volume, members of the Blank Rome team met with the Government on a *near-weekly basis for months* to discuss subpoena compliance, among other things. We also met with the Government on March 31, 2025, at the U.S. Attorney's Office in Greenbelt, Maryland. Despite these regular meetings, the Government never suggested that Blank Rome may have a conflict of interest, notwithstanding that they had been aware of Nair and TS 2's NTSB testimony and the allegedly false certificates for *months*.

40. Blank Rome had several other meetings and exchanges of correspondence with the Government between June 2025 and the date the Indictment was filed. In particular:

a. On June 11, 2025, the Blank Rome team met with the Government at the U.S. Attorney's Office in Greenbelt, Maryland. The Government provided a "reverse proffer" presentation, setting out its theory of the case. This presentation was the first time we learned that the Government alleges that Nair and TS 2 provided false testimony to the NTSB and that the ACB and VCB certificates were false.[3]

b. Additional in-person meetings with the prosecutors assigned to this case occurred on July 23, 2005; September 30, 2025; November 20, 2025; and March 3, 2026. The line

[3] Notably, the relevant ACB and VCB certificates had no role in the Allision whatsoever; rather, they functioned properly and were not a focus of the NTSB investigation.

prosecutors also sent us letters dated August 15, 2025; October 8, 2025; October 23, 2025; and February 3, 2026.

c. We also met with the line prosecutors and more senior attorneys from the U.S. Attorney's Office and Main Justice on March 16, 2026, and March 27, 2026.

41. The Government did not raise the issue of a potential conflict of interest in any of these meetings or its related correspondence.

**The Limitation Action**

42. Synergy Marine and Grace Ocean filed a Petition for Exoneration from or Limitation of Liability on April 1, 2024.

43. Nearly immediately after the Petition was filed, Blank Rome began providing potential claimants with early discovery and access to the Vessel. Discovery in the Limitation Action began in earnest in the fall of 2024, after the deadline to file claims.

44. In late January 2025, I traveled to the Synergy Defendants' offices in Chennai, India, with my colleagues, Thomas Belknap and Weigel, to interview shoreside employees and prepare for depositions. We provided *Upjohn* warnings prior to every meeting, including a meeting with Nair on January 30, 2025. I did not take notes during our meeting with Nair, but Weigel and Belknap have notes from the trip, and Weigel drafted a memorandum summarizing the interviews, including the interview of Nair.

45. During the discovery process for the Limitation Action, several shoreside employees of the Synergy Defendants were deposed, including Nair and TS 2, as well as several DALI crew members.

46. For the shoreside employees, we held an initial group deposition preparation session on June 19, 2025, to cover the overall mechanics of depositions in civil litigation matters

in the United States, best practices for answering deposition questions, and logistics for the depositions themselves. TS 2 attended this group preparation session, but Nair did not, as he already had individual counsel by this time. We did not interview or question any employees.

47. TS 2's deposition was scheduled for June 27, 2025, in London, United Kingdom. Together with my colleagues Belknap, Noe Hamra, and Neil McMillan, I met with TS 2 on June 25-26, 2025, to prepare him for his deposition. I do not have notes from these preparation sessions; however, McMillan prepared an outline and has notes. Moreover, Blank Rome attorneys did not have any email exchanges or other meetings with TS 2 in advance of the deposition.

48. The Synergy Defendants' in-house counsel was in London with the employees who were being deposed, but he did not attend TS 2's preparation session. To the best of my recollection, he did not attend the preparation session because he was attending another employee's deposition at the time.

49. TS 2's deposition occurred as scheduled on June 27, 2025. I attended the deposition, as did my colleagues Belknap and McMillan. The Synergy Defendants' in-house counsel also attended.

50. The Government notes that TS 2 testified that he met with "my lawyers," *i.e.*, Blank Rome attorneys to prepare for the deposition, suggesting that TS 2 may have had the impression that I or my colleagues were his legal counsel. I am confident that is not the case. We made clear to all employees of the Synergy Defendants who were being deposed that we were counsel for Synergy Marine and Grace Ocean in the Limitation Action and would be assisting them with the depositions on behalf of our clients. We provided TS 2 with *Upjohn* warnings in meetings prior to his deposition (*see infra*). The transcript of TS 2's deposition clearly indicates that Belknap, McMillan, and I were appearing as counsel for the "Vessel Interests," *not* as counsel for TS 2.

ECF No. 75-10 at p.4. Additionally, the Synergy Defendants' in-house counsel was present in London and at the Deposition to provide support to the employees.

**<u>Other Meetings with Nair</u>**

51. Beyond the meetings involving Nair that are described above and in the Weigel Declaration, my colleagues had two meetings with Nair, both of which were well after his NTSB interview.

52. On May 20, 2025, Carlson and Alexandra Clark met with Nair via Teams. Neither Carlson nor Clark has notes from this meeting.

53. Kierstan Carlson and Luke Reid also met with and interviewed Nair on July 18, 2025, over a year after his NTSB interview. This meeting was coordinated through Nair's individual counsel, who also attended the interview.

**<u>Other Meetings with TS 2</u>**

54. Beyond the meetings involving TS 2 that are described above and in the Weigel Declaration, Blank Rome had a few additional meetings with TS 2 *after* his NTSB interview but prior to the date on which the Indictment was filed.

55. On June 5, 2024, I attended a call with TS 2 and counsel for certain crew members who were not on the M/V DALI at the time of the Allision. To the best of my knowledge, I do not have notes from this call.

56. Carlson and Reid had a Teams call with TS 2 on March 21, 2025. Carlson and Reid were not able to locate any notes from this meeting.

57. Belknap, Carlson, and I interviewed TS 2 on June 20, 2025. Carlson took notes during this interview and circulated them to several Blank Rome team members. The notes indicate that we provided an *Upjohn* warning to TS 2 and specifically explained our role as counsel

for both Synergy Marine and Grace Ocean in the Limitation Action and for the Synergy Defendants in the criminal investigation.

58. Carlson and Reid also met with TS 2 late in the evening on July 18, 2025, along with a high-level manager from Synergy Marine. Carlson has rough email notes from this meeting and recalls giving an *Upjohn* warning.

**Email**

59. Our records reflect that I, and other Blank Rome attorneys, received emails from Nair and TS 2 or emails on which they were copied, and sent emails on which they were copied. Based on our review of emails exchanged with these individuals, our exchanges can be summarized as follows: (1) all emails prior to the Nair and TS 2 NTSB interviews concerned SITREPS, cargo surveys, salvage operations, and other incident response matters following the Allision; requests for information from the NTSB or Singapore's Maritime and Port Authority, and all but one involved multiple individuals (other Synergy personnel, the NTSB, the P&I Club, etc.); and (2) emails following the NTSB interviews related to similar topics, as well as discovery in the Limitation Action, coordinating visits to the Synergy Defendants' offices and connecting Synergy personnel with our e-discovery vendor, requests for information concerning former crew, and welfare and travel for the crew residing in Baltimore.

I declare under penalty of perjury that the foregoing is true and correct.
Executed on September 10, 2026, at New York, New York.

William R. Bennett, III