**UNITED STATES DISTRICT COURT**
**DISTRICT OF MARYLAND**

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>SYNERGY MARINE PRIVATE LTD., *et al.* | Case No. 26-CR-00118-JKB |

# DECLARATION OF ALAN M. WEIGEL

I, **ALAN M. WEIGEL**, pursuant to 28 U.S.C. § 1746, declare as follows:

1. I am Of Counsel at the law firm of Blank Rome LLP ("Blank Rome"), with offices at 1271 Avenue of the Americas, New York, New York 10120.

2. I have been practicing maritime law for about 27 years and have been with Blank Rome since 2006. Prior to practicing law, I was in the U.S. Navy for over 20 years. I graduated from the U.S. Naval Academy in 1979 and received a master's degree from the U.S. Naval Postgraduate School in 1987. During my naval career, I was a submarine officer, with experience as both a deck officer and engineer and in deep ocean search and salvage. I also commanded a Deep Submergence Vehicle and served ashore in a variety of staff positions. I retired in 1999 at the rank of Commander. In my last few years with the Navy, I attended law school at the University of Connecticut and later went into private practice after my miliary retirement.

3. Together with my colleagues, I represent Synergy Marine Private Ltd. ("Synergy Marine") and Synergy Maritime Private Ltd. ("Synergy Maritime") (collectively, the "Synergy Defendants") in connection with the above-captioned matter. I also am an attorney of record and admitted *pro hac vice* to practice before this Court as counsel for Synergy Marine and Grace

Ocean Private Limited ("Grace Ocean") (collectively, the "Vessel Interests") in the related Limitation Action, Civil Case No. 24-cv-941 (JKB).

4. I submit this Declaration in support of the Synergy Defendants' Opposition to the Government's Motion for a Hearing to Evaluate Potential Conflicts of Interest, which seeks to disqualify attorneys at my law firm, Blank Rome LLP, from continuing to represent the Synergy Defendants in this action (the "Motion"). *See* ECF No. 75. I have reviewed all of the papers filed in connection with the Motion, as it alleges that Blank Rome attorneys, including myself, acted as unsworn witnesses to charged conduct.

5. The statements made in this Declaration are based upon my personal knowledge and my review of my personal notes, as well as emails and Outlook meeting notices involving Karthik Nair ("Nair") and/or [redacted] (the individual referred to in the Superseding Indictment as "TS2") in response to the Motion.

6. I began working on the matter involving the M/V DALI's (the "Vessel") allision with the Francis Scott Key Bridge (the "Allision") within hours of the incident on March 26, 2024, immediately after Blank Rome was retained to represent the Vessel Interests.

7. When Blank Rome was initially retained, the National Transportation Safety Board ("NTSB") and U.S. Coast Guard (the "USCG") already had responded to the casualty and initiated investigations and were moving forward with interviews of Vessel crew members. We advised both Grace Ocean and Synergy Marine in connection with these investigations and cooperated with both the NTSB and USCG. We also immediately began evaluating whether to recommend the filing of a Petition for Exoneration or to Limit Liability, as is customary after a major casualty. Because of my naval background, I was on the Vessel nearly every day in the weeks following the Allsion, and very frequently thereafter until the Vessel departed the United

States. I also worked closely with our retained technical experts while on the Vessel and have continued to do so since that time.

8. About three weeks after the Allision, the Department of Justice initiated a criminal investigation. Blank Rome initially was retained to represent Synergy Marine in the criminal investigation. This representation was later expanded to include Synergy Maritime. Grace Ocean retained separate counsel for the criminal matter.

9. At all times since Blank Rome was initially retained in connection with the Allision, the firm has represented only (1) Synergy Marine (all legal proceedings flowing from the Allision); (2) Synergy Maritime (all legal proceedings flowing from the Allision); and (3) Grace Ocean (NTSB investigation and civil litigation matters only). Although Nair and TS2 have been employed by Synergy Maritime at all times relevant to the legal proceedings arising out of the Allision, neither is nor has ever been a client of Blank Rome. In addition, I personally have never provided legal advice or counsel to Nair or TS2 and neither has anyone at Blank Rome.

10. During the course of Blank Rome's representation of the Synergy Defendants, I communicated with both Nair and TS2. The majority of the communications I had with, or simply involving, Nair and TS2 can be grouped into two categories: (1) email communications to large groups on which I (and other Blank Rome attorneys), Nair, and/or TS2 were recipients, namely the daily "SITREP" reports relating to the status of the incident response and salvage operations for the Vessel; and (2) email communications and/or Microsoft Teams meetings on which either Nair or TS2 were copied or participated, along with other Synergy employees. Regarding the latter category, the emails and Teams meetings related almost entirely to requests for information and documents concerning (1) requests from the NTSB and the Maritime and Port Authority of

Singapore (the "MPA"); (2) discovery in the Limitation Action; and/or (3) requests by Blank Rome in connection with our internal investigation and case preparation.[1]

11. Other than those categories of communications, I had limited direct interaction with Nair and TS2. As discussed more fully below, I briefly met with Nair and TS2 via Microsoft Teams prior to their interviews with NTSB, and I attended their NTSB interviews remotely. I also met with Nair in Chennai, India in June 2024 and January 2025 and attended a Teams call with Nair in January 2025. I attended a group call with TS2 in June 2025.

**NTSB Interviews of Karthik Nair and TS2**

12. The NTSB investigation was divided into working groups by subject area. One working group was the Engineering Group, which consisted of stakeholders from NTSB, ClassNK, the MPA, Hyundai Heavy Industries, Grace Ocean, and Synergy Marine. Synergy Marine's representative in the Engineering Group was an individual who served as a Technical/Fleet Manager but was not responsible for the Vessel.

13. Blank Rome was advised in or around late April 2024, that the Engineering Group requested to interview Nair and TS2. The lead partner on the case, William Bennett, and I had a call with Synergy Marine's in-house counsel and managing director on April 26, 2024 regarding the NTSB investigation, including its interview requests. Karthik Nair briefly joined this meeting, and we advised him that NTSB requested to interview him and asked logistical questions, such as whether he had a visa and could readily travel to the United States.

---

[1] In late November 2024, Synergy Marine requested Blank Rome to assist with a legal matter unrelated to the M/V DALI and the various Government investigations arising out of the Allision. In late November 2024, I had a very limited number of direct emails with TS2 concerning logistics and records requests in connection with this matter. A technical expert was copied on some, but not all, of these emails. In addition, the technical expert and I attended a vessel in Panama from November 23-29, 2024, in support of this matter, and TS2 also attended as a technical representative for the client. My colleague, Luke Reid, the technical expert, and I also joined the same vessel in Newark, New Jersey in early December 2024 in connection with the same matter. There are emails dated during our vessel visit on which TS2 was copied.

14. On May 20, 2024, NTSB advised Synergy Marine's party coordinator that they wanted to move forward the scheduling the Nair and TS2 interviews. Nair and TS2 both agreed to the NTSB's interview requests.

15. Under the NTSB's regulations, Nair and TS2 were permitted to have "one representative of the witness's choosing." 49 C.F.R. § 831.57(a). The representative could be an attorney but was not permitted to advocate during the interview. *Id.*

16. Because both Nair and TS2 are Indian nationals who do not speak English as a first language and the NTSB interviews were unfamiliar, foreign legal proceedings, it was determined that someone from Blank Rome would serve as their "representative." Bennett asked me to be the representative, and I agreed.

17. On May 22, 2024, I was copied on emails with the NTSB and the Engineering Group regarding interview scheduling. Nair's interview was scheduled for May 29, 2024, and TS2's interview was scheduled for May 30, 2024.

18. For context, these NTSB interviews occurred only about two months after the Allision. In fact, the Vessel had just been refloated and moved from the middle of the Patapsco River on May 20, 2024. Synergy Marine and Blank Rome were still very much in an "incident response" mode, and I personally was still spending quite a bit of time in Baltimore and on the ship.

19. On May 28, 2024, I met with Nair by Microsoft Teams regarding his NTSB interview. I gave Nair a verbal *Upjohn* warning at the outset of the meeting. The primary purpose of this meeting was to explain what the NTSB interview would entail and who would be on the call, and to provide best practices for answering questions. In this regard, I explained that it was important to answer questions truthfully, respond to the question that is asked, request that the

interviewer repeat the question if you do not understand it, and so forth. I did not prepare Nair for the interview beyond this limited explanation of the proceedings. Moreover, Nair and I briefly discussed some of the subjects likely to be addressed during the interview; however, I did not substantively interview Nair. Nor did I provide any legal advice to Nair. In preparing this Declaration, I identified handwritten notes from the May 28, 2024, call with Nair, which were about two pages long.

20. I attended a similar call with TS2 on May 29, 2024. This call also focused primarily on the process surrounding an NTSB interview and the best practices for answering questions, and I gave TS2 a verbal *Upjohn* warning at the outset of the meeting. During this meeting, TS2 and I briefly discussed some subjects likely to be addressed in his interview. In preparing this Declaration, I identified handwritten notes of the meeting with TS2, which are less than one page long. Similar to my meeting with Nair, I did not provide any legal advice to TS2, nor did I substantively interview him.

21. The interviews of Nair and TS2 were conducted by the Engineering Group by Teams on May 29 and May 30, 2024, respectively. The NTSB took the lead, but all members of the Engineering Group attended and were permitted to ask questions. I participated from the United States. I do not know where the witnesses were located during the call, but TS2 stated during his deposition that he participated from Singapore. To the best of my knowledge, the interviews were recorded on Teams (video) and the written transcripts reflect that they likely were transcribed by a court reporter who watched the video after the fact. Copies of the written transcripts are attached hereto as Exhibits 1 (Nair) and 2 (TS2). I also took handwritten notes during the interviews which I later transcribed into a Microsoft Word document.

22. As the "representative" for Nair and TS2, my role effectively was limited to providing support to the interviewees and ensuring that they were not asked any inappropriate questions.[2] I was not permitted to, nor did I, object to any questions or advocate for the interviewees. This is confirmed by the NTSB interview transcripts, which reflect that I did not say anything during either interview other than introducing myself.

23. The NTSB's Barton Barnum led Nair's interview. At the outset of Nair's NTSB interview, Barnum indicated that "The Interviewee can have one representative of the Interviewee's choice. And today, that's Mr. Weigel from Blank Rome. The representative may not testify for the Interviewee, and the representative's comments should be limited, and objections are not grounds for the NTSB to refrain from asking those questions." Exhibit 1 at 4.[3] Barnum then requested that everyone on the line introduce themselves. *Id.* I introduced myself by stating as follows: "This is Alan Weigel of Blank Rome, and I'm here representing Mr. Nair." *Id.* at 5.

24. My statement that I was "representing Mr. Nair" referred to my status as his representative under the NTSB regulations. I never indicated to Nair or the NTSB that I was legal counsel for Nair. To the best of my understanding, Nair, the NTSB, and all members of the Engineering Group understood that Blank Rome – including myself – was legal counsel for Grace Ocean and Synergy Marine in connection with the NTSB's investigation of the Allision.

---

[2] Notwithstanding that some of the questioning was unclear or compound, none of the questions asked during either Nair or TS2's NTSB interview was inappropriate, nor did any of the Engineering Group members act inappropriately towards the interviewees. Therefore, there was no basis for objection.

[3] The transcript of Nair's interview indicates that I am with Blank Rome; however, it indicates that I was "Attorney for [redacted] notwithstanding that it was *Nair*'s interview and that I never was an attorney for TS2. The transcript is also full of instances where the person transcribing the interview found Nair's statements "indiscernible," presumably due to his heavily accented English and because there was no court reporter in attendance during the interview to clarify the record. Also, unlike civil depositions, there is no process for submitting errata sheets to correct the transcript in the NTSB proceedings.

25. Barnum also led TS2's interview. At the start of the interview, Barnum indicated that "The interviewee can have one representative of the interviewee's choice. Here today is Mr. Alan Weigel. The representative may not testify for the interviewee, and the representative's comments should be limited, and objections are not grounds for the NTSB to refrain from asking questions." Ex. 2 at 4. Barnum again requested that everyone on the line introduce themselves. *Id.* I introduced myself by stating as follows: "This is Alan Weigel from Blank Rome." *Id.* at 5.

26. The transcript of TS2's interview indicates that I am with Blank Rome, but states that I was appearing as "Attorney for [redacted] (*i.e.*, TS2) notwithstanding that I did not introduce myself as his attorney on the record.[4] Moreover, I never was an attorney for TS2, nor did I represent myself as such to anyone. It is not clear why the person who transcribed the interview indicated that I was appearing as the interviewee's counsel.

27. As with Nair's interview, to the best of my understanding, TS2, the NTSB, and all members of the Engineering Group understood that Blank Rome – including myself – was legal counsel for Grace Ocean and Synergy Marine in connection with the NTSB's investigation of the Allision.

**<u>Other Meetings with Nair and TS2</u>**

28. I also met with Nair and TS2 on a limited number of occasions after their NTSB interviews. I met with Nair (and several other employees of the Synergy Defendants) in June 2024 and January 2025 and attended a Teams call with Nair in January 2025. TS2 also participated in a large group meeting between Blank Rome and Synergy shoreside employees in June 2025.

[4] Like the transcript of Nair's interview, the transcript of TS2's interview also is full of instances where the person transcribing the interview found his statements "indiscernible" but there was no process for correcting the record.

29. In mid-June 2024, along with other colleagues, I traveled to Singapore and Chennai, India, to view the Synergy Defendants' operations, meet with shoreside personnel who were responsible for the M/V DALI, and collect documents requested from the NTSB and potential (and eventual) claimants in the Limitation Action.[5] The meetings in Chennai occurred on June 18-20, 2024. While in Chennai, my colleague, Thomas Belknap, and I met with Karthik Nair on June 20. As with all of the meetings during this visit, we provided a verbal *Upjohn* warning at the outset of our meeting with Nair. It was clear to Nair, and all other individuals with whom we met, that we were engaged as counsel for the Synergy Defendants, not the individuals themselves. Belknap and I took handwritten notes during the meeting. We also generated a memorandum regarding the visit in Chennai, including our interview of Nair.

30. On June 25, 2024, Belknap and I participated in a Teams call with several employees of the Synergy Defendants, including in-house counsel, regarding discovery in the Limitation Action. Nair attended this meeting. To the best of my knowledge, neither Belknap nor I has any notes from this meeting.

31. On January 23, 2025, I participated in an interview of Nair by Teams. In-house counsel for the Synergy Defendants attended this interview, as did my colleagues Joseph Poluka, Luke Reid, Kierstan Carlson, and Alexandra Clark, and a high-level, non-lawyer representative of the Synergy Defendants. Notes taken by Carlson and Clark indicate that Nair was given an *Upjohn* warning and that Nair verbally indicated he understood that the Blank Rome attorneys were counsel for the Synergy Defendants and not for him personally.

---

[5] The Synergy Defendants produced a substantial number of documents to interested parties well before claims were filed in the Limitation Action.

32. In late January 2025, I traveled to the Synergy Defendants' offices in Chennai, India, with my colleagues, Belknap and Bennett. The purpose of this trip was to interview certain employees and begin to prepare them for depositions in the Limitation Action. Our meetings took place on January 27-31, 2025. We met with Nair on January 30. Consistent with prior meetings and standard practice, we again provided a verbal *Upjohn* warning at the outset of all meetings, including the one with Nair. Belknap and I took handwritten notes during the meetings, and Bennett took notes on his laptop. We also generated a memorandum summarizing the meetings for this trip to Chennai, including our interview of Nair. It was clear to all individuals with whom we met that we were engaged as counsel for the Synergy Defendants.

33. On June 19, 2025, my colleagues Bennett, Belknap, Emma Jones, Noe Hamra, and Neil McMillan participated in a group call with all employees of the Synergy Defendants who were scheduled to be deposed in the Limitation Action, including TS2.[6] Synergy Marine's general counsel attended as well. The purpose of this meeting was to describe the overall process of civil depositions and the best practices for answering deposition questions and explain that individual preparation sessions would be required. We did not interview or question any of the attendees of this meeting.

I declare under penalty of perjury that the foregoing is true and correct.
Executed on September 10, 2026, at New York, New York.

Alan M. Weigel

Alan M. Weigel

[6] Although Nair was scheduled for a deposition, he did not attend because he had independent counsel who counseled him in connection with the deposition.